Booth, Judge,
reviewing the facts found to be established, delivered the opinion of the court:
This case is again before the court on motion for new trial by both claimants and defendants.
The claimant company, on October 1, 1898, entered into a contract with the defendant to construct the battleship Maine. The claimant was to furnish all the necessary material entering into the vessel except the armor and armament and to complete the same within 32 months from the date of the contract, viz, June 1, 1901. The defendants agreed to furnish the armor specified in clause 3 of the contract “ within the times and in the order required to carry on the work properly.” The claimant subsequent to the execution *181 of the contract proceeded upon the preliminary arrangements necessary for its proper performance ordered materials, made plans, etc., up to a time when it became a conceded and apparent fact that the defendants would be unable to comply with their engagement respecting the armor. The defendants did not furnish the necessary armor until long after it was needed by the claimant to finish the vessel within the contract period. The last armor plate was delivered by the defendants on August 12, 1902,14 months and 11 days after the date of completion fixed by the contract. The defendants also defaulted in the delivery of armament, augmenting the delay occasioned by the failure to deliver armor to the extent of 2 months and 27 days. The present suit to recover damages for the above defaults was commenced October 11, 1904, and in the petition then filed the ad damnum was stated at $148,868.32; subsequently, on May 18,1912, in an amended petition, this was increased to a total demand of $390,672.32.
The case is not susceptible of differentiation in any of its aspects from a similar case of Wm. Cramp & Sons v. United States, 6216 U. S., 494, except as to proof and measurement of damages claimed. In the former^ase, which involved the construction of the U. S. S. Alabama, the Supreme Court passed directly upon all the contentions put in defense here respecting the liability of the defendants, the rights of the claimant to avail itself of the privileges set forth in clause 3 of the contract, and the legal effects of the inserted proviso to the final release. The above case, taken in connection with an earlier suit between the same parties involving the construction of the U. S. S. Indiana, 206 U. S., 118, precludes a repeated discussion of these issues, despite the vigor and ability with which the same are urged.
The vital distinction between this and former cases of similar import revolves exclusively about the quantum of damages. There is absolutely no room for dispute as to important facts. Dates speak for themselves. The Secretary of the Navy conceded defendants’ default, extended the contract period, and remitted all claims for liquidated damages. It was physically and legally impossible for the defendants to comply with their obligations under the contract; they made no pretense of doing so. It would be idle and meaning *182 less to extend an investigation into tbe realm of conjecture in an attempt to ascertain wbat might have happened if the defendants had complied with their undertaking, upon which the claimant’s obligations expressly depended. There is no possible way of ascertaining whether the claimant could have executed its contract if. the defendants had not defaulted; the presumptions are all in its favor. It had executed contracts of like magnitude and possessed the facilities as well as the technical ability to do so again. The defendants are obviously in no position to assert such a contention in the face of express admissions of default, which, to say the least, prevented the experiment. Pickley v. United States, 46 C. Cls., 77.
The claimant’s progress toward complying mwith the time limit fixed by the defendants in the contract was dependable entirely upon defendants’ obligation to perform a condition precedent. The defendants defaulted and imposed upon the company an extended delay of 18 months and 27 days. The courts have frequently adjudicated cases involving similar conditions; the liability has been determined. Alabama case, supra; Weeks v. Little, 89 N. Y., 566; District of Columbia v. Camden Iron Works, 181 U. S., 453; United States v. Behan, 110 U. S., 338.
In the cases involving the Alabama and Indiana claimant company presented a specific bill of damages, involving a direct pecuniary loss. In this case it is impossible to do likewise. A short time after commencing the construction of the vessel it became notoriously apparent that the defendants would not be in a position to furnish the armor in the order and at the times needed to complete the work. The Secretary of the Navy was powerless so to do because of legislative inhibitions as to price and the unwillingness of armor makers to accede to the same. The claimant under these conditions retarded work on the vessel, employing the bulk of its force on other work in its yard, important and pressing. Up to the time the contract for armor was let by the Secretary, on November 28, 1900,. work on the Maine had been abnormally slow; subsequent to that time, however, work was greatly accelerated and rapid progress made. The shipbuilders were ready for the armor when furnished. The *183 vessel under normal conditions should have been launched in 18 months from the date of the contract. Instead, however, she was not launched until 34 months from the date of the contract, occupying the claimant’s building slip for a time 16 months in excess of the normal period. The claim, therefore, as well stated in claimant’s brief, becomes a property loss as distinguished from one capable of specific proof of a pecuniary outlay. In other words, as to this particular item the damage suffered was the loss to the claimant of its use of the building slip during the deferred period — a loss incapable of direct proof. Claimant company predicates its loss upon the ascertained value of their entire plant less 25 per cent, deducted because of use of yard for other purposes than shipbuilding, and proportion said value among its building slips employed in constructing vessels, claiming a return thereon of 6 per cent per annum.
In this connection it is proper to observe that in ascertaining the intrinsic value- of the slip, wharfage value must be included in making up the total value of the entire plant. Wharfage is an indispensable adjunct to the slip; without wharves the slips would be useless. The two are inseparable, and to ascertain the proportionate value of one the proportion must include the value of the other. Hence, as shown in Finding XI, wharfage is included. This identical method has been heretofore employed by the United States in similar cases and payments made thereunder.
Defendants assail this contention, attacking it because of uncertainty and remoteness, and charging the claimant with dereliction in not prosecuting its work to all possible limits, irrespective of defendants’ default» The findings establish indisputably that the claimant company could have prosecuted work on the vessel to the point of launching, for up to the normal period fixed for said event the defendants’ defaults caused no delay, and the court has computed the delay period from this date. To have launched her, however, would have concededly augmented their final loss, for both parties are in accord in fixing the use value of wharfage as greater than the use value of the building slip. Claimant was obligated under the law to mitigate, so far as possible, *184 all damages which it knew to be certain to accrue by reason of defendants’ breach of the contract. The transaction was a continuing event; it required the exercise of wholesome and sound judgment to determine the proper course to pursue. Claimant could employ the force originally assigned to the construction of the Maine to other and important work in its shipyard. By so doing it obviously saved to itself the more valuable wharfage space, for the vessel would certainly have had to occupy either wharf space or entail the additional expense of dredging a special berth. The findings in both the Indiana and Alabama disclose the extent of direct charges against a vessel afloat at the wharf.
Conceding for the moment the logic of defendants’ contention that the claimant company should have proceeded under the contract to all possible extent despite defendants’ defaults, which under the findings means the completion of the vessel to the point of launching, i. e., April 1, 1900, under these conditions claimant company might have availed itself of two contingencies: It could have launched the vessel and thereafter maintained her at the wharf, or it could have continued to maintain her on the building slip; nothing else could have been done. To have put her in the water would have materially increased the expense incident to her upkeep and necessarily increased the expense to the Government. On this point the record is unanimous. A vessel afloat at the wharf requires the constant attention of numerous employees daily and nightly engaged in vigilant watch over its complicated and costly machinery; it involves the maintenance of steam to keep the machinery in motion, the employment of a tug when necessary to turn her, and the induction and almost constant working of pumping machinery to keep her dry; in fact the innumerable items of expense indispensable in the maintenance of a large battleship, on which at least half, and frequently more than half, of the total consideration for its construction has been incurred, so materially increase the expense of maintenance over and above what it would cost to maintain her on the slip under similar conditions that it can not be and is not controverted.
*185 The next proposition is the direct corollary of the first. It is apparent at a glance that the expense incident to the upkeep and maintenance on the building slip of a vessel from 40 to 50 per cent complete would have cost the defendants more than to allow her construction to drag and thus minimize her proportions. It obviously is more expensive to care for a ship at least half finished than one only about one-fifth complete. The contention, therefore, leads inevitably to but one conclusion, that had the claimant company stood upon the strict letter of the contract, observed it in every particular possible under the circumstances, the defendants and not the claimant would have suffered thereby. The defendants left the vessel with claimant company during the period of delay. The duty cast upon the latter was not only proper care but proper care in the most inexpensive way. The claimant company met its obligations under the contract in good faith, it skillfully delayed normal work when the same was not required by the default of the defendants, and as industriously accelerated the same when necessary to meet the corresponding obligations of the defendants. The Navy Department conceded so much, and the record clearly establishes it. In fact, it is extremely doubtful if the defendants would now be in any better position had the vessel been accepted without her armor. A trial trip without armor as provided for in the contract is not inexpensive ; that contest alone is involved and expensive when undertaken under the adverse conditions presented by this record. The Government would have been put to the expense of caring for a large vessel afloat complete except as to armor, instead of a rental charge for use and occupation of a building slip admitted by both parties to be less expensive. Whatever else in this record may engender doubt, one proposition is indisputable, and that is that the course pursued by the claimant company under the circumstances of this case minimized its claim and saved the defendants material loss. The course pursued was reasonable and right. The breach of a contract gives rise to a cause of action for the damages incurred; the injured party is limited in recovery to the extent of his loss traceable to the breach. Can it be *186 said as a corollary to these elementary principles of law that a party to a contract facing an inevitable breach by the corresponding party, a breach vital to its performance of the agreement, should go forward with the work and thereby accumulate a bill of damages which, by the exercise of ordinary foresight and prudence, could have been foreseen and prevented ?
A most convincing and logical argument predicated upon a comparison of damages allowed on the first trial of this case with ¿he amount allowed in the case of the Alabama exhibits what upon first impression might seem a strong contention hostile to the principle of mitigation of damages. The argument may be sound, but the computation as made by the defendants must be similar. The defendants, as a basis for their figures, take the total judgment awarded the claimant herein and divide the same by the total length of delay, reaching a result which gives a monthly rental value to the slip much in excess of the rental allowed for wharfage in the Alabama case. In the case of the Alabama, however, wharfage value was segregated and allowed as a separate item, quite distinct from the various other items of damage proven in the case. To make the comparison accurate the same method as to each vessel should be adopted, and the total judgment in each case divided by the length of delay. Because in one case the proof enabled the court to fix specifically all the items of damage affords no logical reason for taking the specific item and comparing it with the sum total in another case. In other words, the judgment awarded the claimant in this case covers as a whole all the specific items allowed in the case of the Alabama, and to make the comparison effective the same mode of computation must be adopted. The demonstration of the correct method is found in Finding XI. The total rental value of the slip for the whole period of delay is fixed at $52,885.10, which sum, divided by the whole period of delay, gives a monthly rental for the slip of $2,798.15, exclusive of insurance. With insurance added, the amount is increased to $3,255.54. Pursuing the same method in the case of the Alabama, the rental value of wharfage would amount monthly to the sum of $3,860. These computations, with the differences deducted, clearly *187 demonstrate a mitigation of damages to tbe extent of more than $600 per month by the conduct of the claimant company in the case at bar. The judgment in the Alabama case amounted to $49,792.66 and the delay period was 12.9 months.
Defendants again insist that no reason prevails against the ascertainment of damages in this case different from any other; that proof could and should be adduced fixing in a positive way the rental value of the slip. It is suggested that witnesses can be called competent in every way to supply this testimony. The court has given the contention most serious consideration. The circumstances of the case are such that the adoption of the defendants’ contention would materially confuse rather than simplify the record. No possible means are at hand other than the one approved to ascertain a reasonable rental value of the slip except resort to expert testimony. A reconciliation of numerous conflicting statements based upon varied and confusing hypotheses, developed according to the viewpoint of the particular witness, is an arduous and difficult task even when unavoidable. It affords in the end no better proof that an estimate and reaches no nearer to certainty, if as close, than the method adopted herein. In any event it would be far from conclusive if it failed to adopt the identical basis adopted by the court, a basis which includes within its conception the material value of every part and adjunct of the claimant’s whole property.
Too much importance is placed upon the appearance of the Johnson board in the findings by the defendants. Claimant company furnished in the record the indisputable proof of each item upon which we founded our computation. The Johnson board, it is true, first adopted the method insisted upon by claimant company, but this fact alone did not move' the court in the premises. Eliminating the report entirely would not have affected the case. The judgment is rested upon an analysis of the method and the record proof in the case, with no thought of alone predicating the same upon the fact that a naval board had done likewise. The board’s findings were persuasive but not conclusive.
*188 There are some circumstances connected with the method employed herein of ascertaining the rental or monetary value of the building slip which at first suggest much uncertainty. The use of the building slip for a period of 16 months in excess of normal time was worth something to the company. It will not do to assert otherwise. The claimant, as previously observed, had sufficient work on hand to employ its facilities, and while it is not shown that it refused additional contracts, neither does it appear that it did not or could not solicit the same. Propositions of this character are too nebulous for consideration. The Maine was there, physically present, on the slip, and so remained for a period of 16 months in excess of the normal time. If the claimant had not had another contract, and all its remaining slips were unoccupied, nevertheless under the circumstances of this case the situation would have gone only toward the mitigation of damages, for the use and maintenance of an important and indispensable fixture in the construction of large ships enters into the items of expense included in its making, as it costs no inconsiderable.sum to maintain a vessel on the slip, no matter what else the contractor may or may not be doing.
Taken as a. whole, we think the proof sufficiently certain to warrant a judgment; it is in any view the best proof of which the case is susceptible. It comes within the rule so admirably stated by the late Judge Davis in Meyerle v. United States, 33 C. Cls., 1. The default of the defendants imposed an additional burden on the claimant; it was powerless in the premises to do more than mitigate the damages. The vessel must be cared for either on the slip or at the wharf. Each facility possessed intrinsic worth of proportionate value to all the others indispensable in the conduct of its business enterprise. To go back over a period of years and definitely ascertain the original cost of the slip and sum up the multitudinous improvements and expenditures thereon, and then proportion to it the items of the general upkeep of the entire shipyard, would furnish no more than a very vague and indefinite estimate, even if we exclude the possibility of enhancement in value of both real estate and general equipment. Too many “intervening incidents” inter *189 pose to challenge the substantial correctness of the approximation ; the method involves quite too much uncertainty, too much figuring; the one resorted to is infinitely mo.re direct and simple. It excludes the consideration of every item except rent, and confines the expense to the use of the building slip as 'an integral part of the claimant’s whole yard, eliminating specifically the manifold uncertainties attached to the proof of estimates and approximations predicated upon innumerable unit values proportioned to tonnage and pound weights entering into the construction of the vessel. The computation segregates, as best it may be done, the building slip from the other facilities of the shipyard and fixes its intrinsic value by the best proof as to certainty it is possible to produce. The return of 6 per centum per annum can not be exorbitant; in fact the claimant protests to some extent its allowance, claiming 7 per centum to be more in accord with reasonableness. '
In arriving at this value, however, we can not go beyond the lvalue of the claimant company’s plant as shown in detail upon its books during the period of time covered by the period of delay, i. e., from April 1, 1900, to July 27, 1901, during which time the vessel occupied the slip. The subsequent valuation made by experts in anticipation of financial relief, while doubtless accurate in every particular, can not be given retroactive effect so as to disturb the former valuation with which the company was entirely content, and upon which it must have estimated in anticipating profits for this particular contract. The valuation given the slip by the company during the course of construction of the vessel is the only safe and direct guide in this instance. The subsequent one made in 1902 and 1903, even if entered upon the books of the company prior to the completion of the vessel, had no existence during the period of delay complained of, and could not have formed any part in the company’s past undertakings respecting the cost of building a battleship. The proximate effect of the delay herein is limited to the value of the property used at the time it was used; this is clearly proven and upon it we predicate a judgment.
The second item of the claim respecting proof of loss is unusual. Claimant brings forward proof of the actual cost *190 of labor engaged in constructing the Maine and the U. S. S. South Carolina;, and by a comparison of the two proportioned to the actual weight of structural steel contained in each, it develops that the Maine cost 1.99 cents more per pound for labor than the South Carolina. This contention is untenable. Work on the South Carolina was not commenced until 1906, four years after the Maine had been completed; she was a vessel of larger displacement and different in design. While it is true she was completed according to contract under normal conditions, neither party defaulting, nevertheless the transaction is too remote. In order to assimilate the two transactions within any reasonable compass of certainty we must first attribute the excess in labor cost to the defendants’ delay. This it is impossible to do, for it is apparent from the record that both labor and material had advanced subsequent to the completing of the Maine. As well said in the Meyerle case, supra, “ the cause must produce the effect inevitably and naturally, not possibly nor even probably.” General management, executive ability, experience, and technical knowledge, all at least capable of accumulating from past transactions of a similar kind, are important factors in the cost of work of this magnitude.
Claimant company had refinanced its enterprise, employed new and labor-saving devices, and had in addition the fruitful benefit of past experiences to apply in its management and execution of the South Carolina contract. Something exceedingly potent, aside from the delay of the Government in the Maine, must have transpired to enable the claimant to complete with profit a work of greater magnitude at a less unit cost for labor in the face of an admitted assertion that the same had advanced 10 per centum during the interim. It may be conceded that concentrated and steady work upon a given undertaking may be prosecuted with less expense than intermittent and interrupted service, but from November 28, 1900, until the Maine was complete, as stated in the findings, the work upon her, i. e., labor, was wholly if not much in excess of normal. There is nothing in the record indicating that the delay occasioned by failure to deliver her armor in any way enhanced her labor cost. The *191 possibilities as to cost attending one transaction are far too contingent and uncertain to compare with accuracy a transaction, although substantially similar, occurring from four to six years later, especially so where a judgment of large amount is made entirely dependent thereon.
• The loss to be recoverable must be the direct and proximate effect of the breach, capable of being traced to the injury with reasonable certainty. A substantial hiatus affording sufficient time wherein innumerable incidents disconnected with the transaction may occur, affords a fruitful field for conjecture and precludes such a continuity of proof of damages as the law requires.
The remaining item of loss set forth in Finding XIII is proven specifically and directly, and will be included in the judgment.
The claimant’s motion to amend findings is overruled; the defendant’s motion for a new trial and to amend findings is allowed, and judgment will now be entered for the claimant company in the sum of $61,529;69.
It is so ordered.