## SACHS v. UNITED STATES.
### No. 43565.

Court of Claims.
Oct. 1, 1945.

60

WHITAKER, Judge.

Plaintiff had a contract for the construction of an electrical underground distribution and street lighting system at Fort Sam Houston, Texas. It sues for damages for delays alleged to have been caused by the defendant and for certain other things required of it which it alleges were over and beyond the requirements of the contract and specifications.

1. The delays for which plaintiff sues are (1) a delay in the beginning of the work alleged to be due to the defendant's tardiness in executing the written contract; and (2) for delays caused by four stop orders.

The contract was awarded plaintiff on February 7, 1934. On February 12 plaintiff received triplicate copies of the written contract, which was dated February 8, 1934. It promptly signed all three copies, but it did not receive a signed copy from the defendant until sometime between March 16 and March 28, 1934. The contract provided that work should be commenced on February 8, 1934.

■ We are of opinion that defendant's delay in the execution of the contract afforded no sufficient excuse for plaintiff to postpone commencement of work under it. The contract was prepared by defendant and promptly mailed to plaintiff for signature. Plaintiff was, therefore, fully aware of the terms of its contract and it knew that its execution by the defendant was a matter of course. There was, therefore, no reason for it to delay commencing the work. The case of Thomas Earle & Sons, Inc. v. United States, 90 Ct.Cl. 308, relied upon by plaintiff, is not to the contrary. In that case plaintiff asked permission to proceed prior to receipt of notice to proceed and prior to approval of the contract. It was permitted to do so, but with the understanding that it would be at its own risk. It sued for damages for a delay caused by a stop order issued between the date it had started the work and the date notice to proceed was received. Such are not the facts in the case at bar.

Moreover, the findings show that the plaintiff was largely responsible for the delay in commencing the work by failing to furnish for approval the equipment to be used in carrying out the contract. Special Condition 6 of the specifications reads:

B. J. Gallagher, of Washington, D. C. (M. Walton Hendry, of Washington, D. C., on the brief), for plaintiff.

F. J. Keating, of Washington, D. C., and Francis M. Shea, Asst. Atty. Gen., for defendant.

Before WHALEY, Chief Justice, and LITTLETON, WHITAKER, JONES, and MADDEN, Judges.

"*Data with bids*.—Bidders shall furnish with their bid a complete list and complete data on all material and apparatus they propose to furnish; this shall include manufacturer's name, style and type, full electrical rating, physical characteristics, etc. Failure to provide such data may be considered cause for the rejection of any bid."

This specification was not complied with. The only data submitted by plaintiff prior to receipt of award of the contract was with reference to certain transformers, lighting standards, submersible oil switches, and a main substation oil switch. In submitting this data plaintiff said that it was sure that was all that was necessary since the other items would be furnished in accordance with the specifications. It was not all the data that was necessary by any means and defendant subsequently requested considerable additional data and this was furnished by plaintiff at various times between March 1 and May 14, 1934.

██ It is true that defendant did not avail itself of its right to reject plaintiff's bid for failure to furnish the necessary data but it did not relieve plaintiff of the obligation to furnish it before the material was ordered and installed, as was required by General Condition 17 of the specifications. This required the contractor to furnish the names of the manufacturers of all mechanical appliances with their rated capacities "and other necessary information to the C. Q. M. for his written approval before ordering or purchasing any of the above equipment." This condition was never waived by defendant, and plaintiff's delay in complying therewith was chiefly responsible for the delay in starting the work.

Defendant issued four stop orders. The first was dated May 3, 1934 and continued in effect until June 3, 1934. It was issued because the ducts and vaults had not been completed by defendant, although paragraphs 10 and 11 of the specifications represented that they had been completed and were ready for use.

The next stop order was issued on June 4, 1934, and remained in effect until October 20, 1934. It applied to only a small portion of the work, that of setting and installing street lighting standards on Division Avenue north of Sixth Street, and that portion of the project east of Division Avenue. It was issued, as it shows on its face, "because of interference by the Government in doing the necessary grading in the N. C. O. area." The subsequent order lifting the stop order recited:

"You will be exempt from liquidated damages on only ninety-two (92) calendar days of the entire time covered by this stop order since you were stopped on only a portion of the work under your contract. The 92 calendar days represent the actual delay in the completion of the entire job occasioned by this stop order."

The next stop order was issued on July 1, 1934, and remained in effect until September 18, 1934. This also related to a very small portion of the work. As shown by the stop order, it was "occasioned by interference by the Government in doing the necessary filling and grading around the Ordnance Building and Quartermaster Warehouse." The order revoking it recited:

"You will be exempt from liquidated damages on only twenty-five (25) calendar days of the entire time covered by this stop order since you were stopped on only a portion of the work under your contract. The 25 calendar days represent the actual delay in the completion of the entire job occasioned by this stop order."

The next stop order was dated July 26, 1934, and remained in effect until August 15, 1934. It suspended work on the secondary underground boxes and secondary underground cable in the 75 officers' and 94 noncommissioned officers' quarters area. This also related to a small part of the entire work. The order revoking it recited:

"You will be exempt from liquidated damages on only twenty (20) calendar days of the entire time covered by this stop order since you were stopped on only a portion of the work under your contract. The twenty calendar days represent the actual delay in the completion of the entire job occasioned by this stop order."

It will be noted that the Construction Quartermaster has found that the completion of the entire job was delayed 137 days by three of these stop orders; the stop order issued on May 3, 1934, caused a delay of 32 days, but there was no finding that the entire job had been delayed by it to any particular extent. The commissioner, however, has found that the

delays were not cumulative, "because a large portion of the contract work in other areas and some of the work in the same areas could and did proceed, notwithstanding the cessation of the particular work specified in the stop orders." He has further found that the plaintiff could have completed the entire contract work within the 150 calendar days specified by it for the completion of the work, plus the additional time allowed for additional work called for by change order A; and he has found that the work actually required 217 days from the date of substantial commencement of the work. He, therefore, concludes that the total delay in the completion of the entire job was 67 days. We have adopted his finding as the most accurate computation of the delay actually caused, as disclosed by all the facts.

The parties are in substantial agreement as to the items of damage incident to the delay, with the principal exception of the amount to which the plaintiff is entitled for office overhead. The proof shows that the total cost of all work performed by plaintiff during the year in question was $312,519.20, and that the cost of this particular job was $112,520.27. Its total office overhead for the year was $23,258.58. Allocating this overhead to this job in proportion to the cost of this job to the cost of all jobs in the office during the year, results in the figure of $8,373.09 as that part of plaintiff's office overhead attributable to this particular job. This amount, divided by 365, gives an office overhead of $22.94 per day, or a total of $1,536.98 for the 67 days of delay.

The other items of damage as set out in finding 23 are supported by the weight of the evidence.

■ It results that plaintiff is entitled to recover the total sum of $2,979.49 for damages caused by the delays incident to the issuance of the 4 stop orders.

■ 2. As shown by the findings, defendant left large piles of dirt in places where plaintiff was required to dig trenches in which the cables were to be laid. The specifications required that the trenches be dug to a depth of 24 inches below finished grade for 600-volt cable, and 36 inches for 5,000-volt cable. On account of the piles of dirt left by defendant, plaintiff had to dig trenches from 3 to 4 feet deep in excess of the depth required by the specifications. This it did

at a cost of $760.00. Plaintiff is entitled to recover this amount.

■ Defendant says plaintiff is not entitled to recover because it took no appeal from the findings of the contracting officer denying this claim. This, however, is not a good defense for at least one reason, to wit, because a copy of the findings was never delivered to the plaintiff, but, instead, was sent to the Comptroller General, who denied plaintiff's claim. As we have frequently held, the findings of the contracting officer, uncommunicated to plaintiff, are not such findings as are made conclusive by the contract. Where the contracting officer fails to communicate these findings to plaintiff, plaintiff is entitled to resort to this court for relief.

■ 3. Plaintiff's next item of claim is for $6,022.66, the extra cost of laying the cables due to defendant's requirement that it take out all kinks in the cables.

Defendant's inspector did require plaintiff to lay the cable in a substantially straight line, but did not require that the cables be drawn taut. Plaintiff was permitted, and in fact directed, to leave waves in the cable to take care of contraction. The specifications required that the cable be laid not less than 4 inches apart. The inspector's requirements did not go beyond the requirements of the specifications.

■ Moreover, although plaintiff protested to the Construction Quartermaster against what the inspector was requiring, it did not pursue its protest further, and for this additional reason it is not entitled to recover.

4. As shown by the findings, defendant required no more of plaintiff with respect to cleaning the manholes than was justified by the specifications; nor were more tests required by the defendant than were called for by the specifications; nor did defendant require more of plaintiff by way of leaving spare leads than was required by the specifications.

■ 5. Paragraph 21, page 28, of the specifications reads in part as follows:

"All aerial services shall be dismantled to the main overhead line and all such materials shall be delivered to location where directed."

As a result of removing the connections between building No. 26 and a pole, this pole fell and threw into the street and into an adjacent parking area a line carry-

ing a high voltage. The pole fell because it was decayed and because its support formed by the wire to building No. 26 was removed. It fell through no fault of plaintiff. Defendant required plaintiff to clear up the wire. This necessitated the removal of connections to a distance of 3 poles away from the building. This was work not required by the specifications, but was done by the plaintiff without protest in the emergency. No claim was made for the cost thereof until plaintiff presented all of its claims to the contracting officer on August 12, 1935. Since the work was done in an emergency, plaintiff is not barred by failure to secure an order in writing for the extra work; however, the proof of cost of doing this extra work is insufficient, it is only an estimate, and for this reason plaintiff is not entitled to recover.

6. As shown by the findings, the evidence does not show that defendant was responsible for the burning out of the transformer which plaintiff was required to replace and, therefore, plaintiff is not entitled to recover on this item.

7. Plaintiff is not entitled to recover the excess cost of using varnished cambric lead cable to make connections in the manholes between transformers and junction boxes. The specifications provided for rubber covered cables only in cases where the use of such cables was applicable and directed. The Constructing Quartermaster ruled that the use of rubber covered cables was not applicable in making connections between transformers and junction boxes, and directed that a different sort of cable be used. The findings show that in common practice rubber covered cable was not used to make such connections. The Constructing Quartermaster's ruling was justified by the specifications and was within the authority conferred upon him by General Condition 10 of the specifications designating him as the interpreter of the intent and meaning of the specifications.

On the whole case the plaintiff is entitled to recover from the defendant the sum of $3,739.49. Judgment for this amount will be rendered. It is so ordered.

WHALEY, Chief Justice, and LITTLETON, Judge, concur.

MADDEN and JONES, Judges, took no part in the decision of this case.