## JAMES STEWART & CO., Inc., v. UNITED STATES.

### No. 45394.

Court of Claims.

Jan. 7, 1946.

John W. Gaskins, of Washington, D. C. (King & King, of Washington, D. C., on the brief), for plaintiff.

William A. Stern, II, of Washington, D. C. (Francis M. Shea, Asst. Atty. Gen., on the brief), for defendant.

Before WHALEY, Chief Justice, and LITTLETON, WHITAKER, JONES, and MADDEN, Judges.

WHITAKER, Judge.

Plaintiff had a contract for the erection of the United States Court House at Foley Square, New York City. It sues for damages for delays due to two things: first, delay in furnishing models for the capitals of columns and pilasters; and, second, in making changes. The defendant admits the delays but denies that they were as long as the plaintiff insists they were. The plaintiff says these two things delayed it a year; defendant says the delay did not exceed 88 days, if so much.

The building is thirty-one stories high. The first six floors occupy substantially all the site. The roof over the sixth floor is flat. Rising above it is a tower twenty-five stories high. This is set back from Pearl and Duane Streets and from Foley Square about the same distance. It covers about one-third the area of the roof over the sixth floor.

There are ten granite columns four stories high on the Foley Square front. On the top of these columns are Ionic capitals. Flanking these columns are pilasters with capitals of similar design. These pilasters

continue down the Duane Street side and around a return bordering on a church property in the rear and also run a part of the way down Pearl Street. The capitals support the stone work on the two floors above.

The contract provided that the defendant should furnish the models for the capitals. Very soon after the work had started, Cass Gilbert, the private architect employed by defendant, asked the defendant's supervising architect to let to plaintiff the contract for the models, in order that plaintiff might sublet it to a subcontractor to be selected by the architect, thus avoiding the necessity for competitive bids. The architect believed the work of preparing these models should be given to him who could do it best and not to him who would do it the cheapest. At first the supervising architect agreed, but later, doubtful, no doubt, of the legality of such action, he notified the architect that the work must be let on competitive bids.

The architect refused to recede and the point was argued pro and con. In the meantime Gilbert went to Europe, and his son, who was left in charge, requested that a decision be postponed until his father's return, irrespective of the effect this would have on the progress of the work. He was gone three months. After his return the matter was debated further, with the result that the supervising architect finally agreed that the man Gilbert had selected should be employed to do the work.

The controversy extended over a period of ten months. The contract for the models for the granite capitals was not let until January 23, 1934, although plaintiff had entered into the subcontract for the granite on March 7, 1933, nearly a year before.

The result was that when plaintiff reached the top of the fourth floor where the capitals were needed it had to stop the stone work on the lower six floors except in the rear and on a part of the Pearl Street side. This left this part of the first six floors unenclosed, with the result that no interior work could be done there. The unenclosed portion was about 50 percent of the total area of the first six floors.

The proof shows the plaintiff was ready for the first capitals on March 22, 1934, and for the others on April 3 and April 14. The first capitals to arrive on the job was about July 22, 1934, a delay of four months. The stone work on the Pearl Street front was completed September 13, 1934, on Duane Street on October 5, 1934, and on Foley Square on November 12, 1934. The portion of the first six floors where capitals were not required were fully enclosed and waterproofed in June 1934, but where they were required they were not fully enclosed and waterproofed until December 12, 1934.

When the stone work was stopped on the first six floors plaintiff proceeded with the stone work on the tower and minimized the delay all it could.

Partitions were erected in the enclosed part of the first six floors and in the tower, but they could not be erected in the unenclosed portion of the first six floors because the covering on the pipes that ran up through the partitions would have been ruined by the weather.

Furring and lathing were done where the partitions had been erected, but the proof shows that the plastering could not have begun until after the first six floors had been fully enclosed and the partitions therein had been erected and the furring and lathing had been done. It was not begun until February 7, 1934, four months later than it would have been except for the delay, and the proof shows this was as early as it could have been begun consistent with good business practice.

Although the jury pool delay further restricted the area in which the plasterers could work, it still is not altogether clear why plastering could not have been carried on in the tower and in the rest of the enclosed portion of the first six floors while waiting for the remainder of the first six floors, but the clear preponderance of the proof is that it could not have been. All of plaintiff's employees, its vice-president, its superintendent, and its assistant superintendent so testify; the subcontractor for the plastering so testifies; and defendant's assistant construction engineer corroborates them. This latter witness says the contractor "would have lost his shirt" if he had carried on the work this way. He agrees that February 7, 1934 was as early as he could have started.

This was four months later than he could have started had there been no delay in furnishing the models. All of the interior finish work followed the plastering, and the final completion of the building was correspondingly delayed.

Defendant says that a carpenter strike was in part responsible for the delay. Whether there would have been any delay due to this strike if the models had been delivered on time, we do not know, but we do know defendant's failure to deliver the models on time would have caused this delay whether or not there had been a strike. Cf. William Cramp & Sons Ship & Engine Building Co. v. United States, 50 Ct.Cl. 179, 181, 182.

The contracting officer granted an extension of time of six months for the delay "due to the models and the carpenters' strike." We are satisfied that a delay of four months was due to the delay in furnishing models.

There were numerous changes made. With respect to many of them defendant procrastinated greatly in making up its mind what it wanted to do or could do with the funds available, and as a result greatly and unnecessarily delayed plaintiff in doing the work in the particular areas.

Plaintiff complains of the delay in connection with (1) the jury pool; (2) the strong room for the Federal Bureau of Investigation; (3) the telephone booths; (4) the relocation of steam risers; (5) the change to acoustic plaster; (6) the panel work; (7) the rearrangement of the quarters for the Federal Bureau of Investigation; (8) the quarters for the referees in bankruptcy; (9) the pistol range for the Federal Bureau of Investigation; and (10) the change on the 30th floor.

Many of these delays were concurrent; they all contributed, more or less, to the delay in the final completion of the building, but just how much each one delayed final completion it is impossible to say. The building was completed about a year later than plaintiff had expected to complete it. Defendant's procrastination was largely responsible therefor. We have found that the model delay caused a four months' delay in final completion, and we are of opinion that the unnecessary delays in making changes caused another three months' delay.

Some delay was necessarily caused by making changes. For these defendant is not liable; United States v. Rice et al., 317 U.S. 61, 63 S.Ct. 120, 87 L.Ed. 53; but it is liable for any unnecessary delay; Magoba Construction Co. v. United States, 99 Ct.Cl. 662, 690; Silberblatt & Lasker, Inc., v. United States, 101 Ct.Cl. 54, 80. Cf. B–W Construction Co. v. United States, 97 Ct.Cl. 92, 114.

Defendant took 198 days, from November 16, 1934 to May 13, 1935, to act on plaintiff's proposals for changes in the strong room for the Federal Bureau of Investigation.

From February 14 to April 19, 1935 plaintiff was standing by awaiting plans for the rearrangement of the quarters for the Federal Bureau of Investigation, and it waited from April 19 until July 31, 1935 for its proposal to be accepted, a total of 167 days.

From March 11, 1933 to December 5, 1934 defendant delayed selecting quarters for the referees in bankruptcy and, even after it had done so and had sent plaintiff plans therefor, it further delayed until August 17, 1935 in deciding on the work to be done therein. This was a total elapsed time of two years and five months, and a delay of eight months and twelve days from the time plaintiff was furnished plans for the work.

Before January 9, 1935 the Federal Bureau of Investigation decided it wanted a pistol range in the basement, but it took until July 31, 1935 to decide on what it wanted.

There were a number of other delays going on at the same time as these that have been mentioned which also contributed to the delay in final completion. These have been set out in the findings.

On February 3, 1936, after all the work had been completed, except for omissions and corrections, called "punch list work," plaintiff wrote the construction engineer setting out 13 causes of delay and asking for an extension of time on account thereof. On March 11, 1936 the contracting officer replied by letter in which he said that plaintiff would have completed the work "within the contract time as previously extended [November 15, 1935] had it not been for the extensive changes which were necessary in connection with the quarters of the referees in bankruptcy, the Bureau of Investigation, the Pistol Range [sic] and the temporary lighting fixtures. All other items which you mentioned in your letter are subservient to these causes of delay." He then says, "the time required to settle these matters was due to the shortage of funds for the completion of the building"

and the consequent necessity of revising the drawings several times, and he concludes: "It is therefore the opinion of this Division that this period amounting to 169 days represents the actual delay occasioned by the Government in making these changes."

■ We must confess that we do not altogether follow the reasoning of the contracting officer in arriving at the extent of the delay, but it is the finding of defendant's representative selected by it to make such a finding as a basis for an extension of time, and certainly, the defendant cannot complain if we accept it as correct in determining its liability for damages for delay. Irwin & Leighton v. United States, 101 Ct.Cl. 455. Nor do we think plaintiff can complain, because we think it is reasonably clear that the delay did not exceed this time.

■ It must be remembered, however, that defendant was entitled to a reasonable time to determine upon these changes and that, to this extent, it is not liable for any delay it may have caused in doing so. After giving careful consideration to all the testimony we have concluded that three months of this delay could have been avoided by the exercise of reasonable diligence. For so much of the delay defendant is liable.

This is a total delay incident to the models and the changes of seven months. Plaintiff asks for its field and home office overhead for the period of the delay. For the last seven months it was on the job plaintiff's field overhead was $53,623.21, as shown by its exhibit 192, the accuracy of which defendant's brief does not question.

Its home office overhead for the seven months is not shown. Plaintiff, however, did show its home office overhead for the 12 months' period beginning April 1, 1935, and ending March 31, 1936, and it is fair to assume that for the last seven months of this period its overhead would be 7/12ths thereof. This amounts to $20,196.79.

■ This is the proportion of the total home office expense which the amount spent on this contract during the seven months period bears to the amount spent on all contracts during the same period. This is not in exact conformity with the rule laid down in Herbert M. Baruch Corporation, Ltd., et al. v. United States, 93 Ct.Cl. 107; Brand Investment Co. v. United States, 58 F.Supp. 749, 102 Ct.Cl. 40; and Sachs v. United States, Ct.Cl., 63 F.Supp. 59, but it accomplishes about the same result. Since plaintiff agreed with defendant's accountant, on the taking of testimony, that this was the correct method of computation to be used in this case and since it accomplishes substantially the same result as the application of what we think is the correct rule, we have adopted it.

Plaintiff also sues for the increased wages its electrical subcontractor had to pay as a result of the delay. It says that these increased wages would not have been incurred if the contract had been completed before July 1, 1935, as it would have been except for defendant's delays.

■ However this may be, it is clear plaintiff's subcontractor has no right of action against it by reason of this provision of the contract between them: "and the Sub-Contractor further agrees that the allowance of additional time for the completion of the work precludes, satisfies, and cancels any and all other claims by it of whatever nature on account of such delay."

If plaintiff is not liable to its subcontractor for damages for delays, defendant is not liable to plaintiff therefor. Severin v. United States, 99 Ct.Cl. 435, 442.

Plaintiff is entitled to recover from defendant the sum of $73,820.00. Judgment for this amount will be rendered. It is so ordered.

WHALEY, Chief Justice, and JONES and LITTLETON, Judges, concur.

MADDEN, Judge, took no part in the decision of this case.