F. H. McGRAW AND COMPANY

v.

The UNITED STATES.

No. 49237.

United States Court of Claims.
April 5, 1955.

Joseph Lotterman, New York City, for plaintiff. Lotterman & Tepper, New York City, were on the briefs.

John F. Wolf, Washington, D. C., with whom was Warren E. Burger, Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

WHITAKER, Judge.

The plaintiff, F. H. McGraw and Company, alleged eight causes of action in its petition, but in its proposed findings before the Commissioner and its argument before the court it urges only two grounds for recovery: one is to recover damages for itself and its subcontractors for an alleged breach of contract arising out of a stop order issued by the Veterans Administration; the other is to recover increased wages for itself and its subcontractors which were paid under authorization of the Wage Adjustment Board.

The plaintiff entered into a standard form of contract with the United States through the Veterans Administration on February 8, 1945, for the construction of certain additions to the Veterans Hospital in Dearborn, Michigan. The original contract price was $3,000,947.00. The work was to be completed within 400 days after notice to proceed. Notice to proceed was given on February 21, 1945, thus fixing the date for the completion of the work as March 28, 1946. The Veterans Administration (hereinafter referred to as the VA) accepted the work as substantially complete on January 30, 1948. The work performed by the plaintiff and its subcontractors actually con-

sumed 1073 days instead of the 400 days as contemplated under the original contract. The contracting officer found that the plaintiff was not responsible for any of this delay. He granted extensions of time to cover this extra period and assessed no liquidated damages against the plaintiff.

Under the contract plaintiff agreed to construct two buildings known as units "B" and "C," which were ten-story wings of the main hospital building; a separate three-story building known as building No. 19; two connecting corridors; and some alterations to the boiler house building. As originally designed, the first six floors of unit "B" were to consist of office space, and the remaining four floors of general hospital space; unit "C" was to consist entirely of general hospital space and facilities; and building No. 19 was designed as the kitchen building.

1. Although plaintiff had great difficulty manning the job from its inception due to the general shortage of construction workers, which was aggravated by the removal of wage controls on nonfederal work when the war ended about six months after the work started, it had fully manned it by the spring of 1946 and work was then in full progress. Then, on August 23, 1946, the VA issued a stop order suspending forty to fifty per cent of the work on unit "B" and 20 to 30 per cent of the work on unit "C," until certain contemplated changes could be decided on. On August 27, 1946, it issued a supplemental stop order suspending all work on building No. 19. The stop order and supplement thereto (hereinafter referred to as the stop order) are set forth in finding 24.

This stop order, which emanated from the VA central office, was issued without consultation with the VA's representatives on the project or with the plaintiff to determine its wisdom or advisability. Upon receipt of the stop order the plaintiff immediately notified the VA that compliance with it would result in the loss of a substantial part of the labor force which had been so difficult and so expensive to obtain and that it would be time-consuming and expensive to reman the job and would adversely affect the job progress and costs; nevertheless, plaintiff on August 30, 1946, ceased operations in the areas believed to be affected by the stop order. Plaintiff's work on the project was 66.5% complete at that time.

The areas in units "B" and "C" which were affected by the stop order were not at all clear. The stop order suspended all work on the first, third and tenth floors of unit "B" and all work south of designated columns on all floors of unit "B"; all work on the third floor of unit "C", and all work north of designated columns on the second, fourth, fifth, sixth, seventh, eighth, ninth and tenth floors of unit "C"; but in order to determine where work could safely proceed in other areas, it was necessary to know what the changes were and to have the mechanical drawings, so that the mechanical trades could determine how the stopping of all work on certain floors and in certain areas would affect their work on other floors and in other areas.

The preliminary prints of the revised drawings indicating proposed changes were sent to the plaintiff on September 6, 1946, with instructions to proceed with the work in unaffected areas. However, the preliminary prints showed that the proposed changes, which were extensive and complicated, would materially affect and curtail the work of the mechanical trades, and thus the finishing trades, in the so-called "unrestricted" areas. For example: In unit "B" where the work was stopped completely on the first, third and tenth floors and in areas south of designated columns on all the floors, the prints indicated that a morgue and embalming rooms and general office space and handicraft workshops were to be installed on the first floor; a patients' dining room, serving kitchens, dishwashing rooms, offices, and three wards, on the third floor; an operating suite, on the tenth floor; and various other changes, on the remaining floors. The mechanical installation necessary to service the proposed accommodations, such as plumbing,

heating, and wiring, originated in the basement of the building and obviously each floor through which they were required to go was affected by the changes.

It was not until October 1, 1946, that plaintiff received the drawings and specifications covering proposed changes. Plaintiff was requested to submit a detailed proposal covering the cost of the proposed changes. On October 8, 1946, the VA's senior project manager visited the project, and after discussing plaintiff's rough estimate of the costs of the proposed changes, advised plaintiff that the estimate was greater than the funds available and that it would be necessary to revise the proposed changes. On November 13, 1946, plaintiff received new drawings and revised specifications. These new drawings and specifications, which were modified on November 14, 1946, became the final changes. Plaintiff submitted its proposal on or about January 7, 1947, and the VA gave the plaintiff notice to proceed on the changes on January 29, 1947, thereby lifting the 159-day partial stop order.

On December 2, 1947, Change Order "XX" was issued increasing the contract price by $403,245.41, which represented the contracting officer's equitable adjustment for the changes made by the new drawings and specifications. This did not include any amount for damages for delay because the contracting officer and head of the department stated that they had no authority to award damages.

The plaintiff contends that the changes were beyond the scope of the contract and that the VA's stoppage of the work, together with its failure to promptly decide on the changes to be made, was a breach of its contract. The defendant contends that since the VA reserved the right under Article 3 of the contract to make changes in the drawings and specifications within the general scope thereof at any time, and also reserved the right under section 3(h) of the specifications to suspend any portion of the contract work, the partial stop order and delay incident thereto was not a breach of the contract.

The changes made under change order "XX" were within the general scope of the contract. Although the changes were extensive, they were not so extensive as to be a cardinal change. See General Contracting & Construction Co., Inc., v. United States, 84 Ct.Cl. 570. That the defendant had the right to make changes is clear. Article 3 of the contract.

■■■ The plaintiff contends that the stop order was unjustified and as such was a breach of its contract, citing and relying on Brand Investment Co. v. United States, 58 F.Supp. 749, 102 Ct.Cl. 40. It is true that an unjustified stop order is a breach of the contract. However, it would appear that in view of the extensive proposed changes, the issuance of the stop order was justified in this case. Without the stop order, unnecessary expense would have been incurred in doing work and then tearing it out and doing it again.

But plaintiff's contention that the VA unreasonably delayed in deciding on the changes to be made is well founded. It is settled that the defendant is allowed under the contract only a reasonable time within which to make permitted changes in the specifications and that the defendant is liable for breach of its contract if it unreasonably delays or disrupts the contractor's work. J. A. Ross & Co. v. United States, 126 Ct.Cl. 323, 332; Continental Illinois National Bank & Trust Co. v. United States, 101 F.Supp. 755, 121 Ct.Cl. 203, 243, certiorari denied 343 U.S. 963, 72 S.Ct. 1057, 96 L.Ed. 1361; James Stewart & Co. v. United States, 63 F. Supp. 653, 105 Ct.Cl. 284, 328; Severin v. United States, 102 Ct.Cl. 74, 85; Silverblatt & Lasker, Inc., v. United States, 101 Ct.Cl. 54, 82, and the cases there cited.

In the instant case, the VA, fully aware of the construction manpower shortage in the Dearborn area, the difficulty and expense that the plaintiff had been put to in order to successfully man the job, the constantly increasing cost of labor, material and equipment, and that the project was 66.5% complete, decided, without consulting its representatives on the job

or the plaintiff, to issue a partial stop order, which was ambiguous, with no one on the project empowered to interpret it so that the plaintiff could safely proceed in the unaffected areas, and held up the work 159 days before authorizing plaintiff to proceed.

Two weeks after the issuance of the stop order, the VA sent plaintiff preliminary prints, but these were of little value without the mechanical drawings. Five weeks later the plaintiff received the revised drawings and specifications with instructions to submit a detailed cost proposal for the indicated changes. While the plaintiff was in the process of working up a definite proposal, the VA decided that the changes would cost too much as indicated by the rough estimate, and again it revised the specifications. Over two and a half months later the plaintiff received another set of revised drawings and specifications and a request to submit a cost proposal on the changes. The plaintiff took one and a half months to submit its cost proposal, which also included claims for part of the plaintiff's and its subcontractor's damages. After its submission it took the VA twenty days to decide to give the plaintiff notice to proceed with the changes. One hundred fifty-nine days elapsed from the issuance of the stop order to the time plaintiff was permitted to resume work.

We believe that it was not in contemplation of the parties in this case that there should be so long a delay in deciding on the changes to be made. For all delay of over a month we think defendant is liable in damages.

The delay not only resulted in complete suspension of the work in the affected areas, but also prevented the doing of much work in the so-called unaffected areas, because many of the changes to be made were on the upper floors, which necessarily affected much of the work on the lower floors, such as plumbing, heating, and electrical work; and the inability to do such work affected the construction of partitions and practically all of the inside work.

During the stop order period plaintiff's labor force was substantially reduced because of lack of work that could be done. In August there were employed on the job 266 men; in September, 243; 190 in October; 126 in November; and 139 in December. Labor was hard to get; it had been very difficult to man the job in the beginning, and more difficult after the lifting of the stop order, because of the regulations of the Wage Adjustment Board, discussed later.

There can be no doubt that plaintiff was severely damaged, which could have been avoided by more foresight on defendant's part and more diligence in deciding on the changes to be made.

■ 2. Plaintiff next contends that it is entitled to recover the full amount of the wage increases which it paid for the work under the original specifications. It was paid for the increased wages paid for doing the work called for by the change orders. The plaintiff's argument is that the VA, who was a party by ratification to the Wage Stabilization Agreement of May 22, 1942, which stabilized wages at a certain level, breached that agreement by allowing wage increases. The Wage Stabilization Agreement was an agreement between various government agencies and the Building and Construction Trades Department of the American Federation of Labor wherein it was agreed that wages would not be increased on national defense work except under certain conditions.

It is obvious that this agreement was not entered into for plaintiff's benefit and was no part of its contract. Moreover, the agreement, as amended before the letting of the plaintiff's contract, under one of its exceptions, allowed wage increases where the July 1, 1942 rates were inadequate because: "* * * (b) they were applicable in a locality where changing conditions in the building construction industry require a revision of wage rates; * * *."

In order to properly man the job the plaintiff applied for and received approval

for wage increases. Neither the VA nor the Wage Adjustment Board directed any increase in wages; it merely permitted an increase; and it was reiterated again and again that the cost to the Government would not be increased on account thereof.

The rulings and regulations pertaining to reimbursement for increased wages, relied on by the plaintiff, relate to contracts containing a clause specifically allowing such reimbursement. The plaintiff's contract contains no clause allowing reimbursement and, therefore, there is no obligation on the part of the defendant to make reimbursement. Irwin & Leighton v. United States, 115 Ct.Cl. 18; Kirchhof v. United States, 102 F.Supp. 770, 121 Ct.Cl. 476.

3. The plaintiff is also suing to recover damages for the benefit of seven of its subcontractors and one supplier. Six of the subcontractor's contracts contained exculpatory clauses and a release of all liability on final payment, which completely exonerated plaintiff from any liability whatsoever to the subcontractors. The other subcontractor's contract, while not containing the exculpatory clause, it did contain the release of all liability on final payment, which completely exonerated the plaintiff from any liability whatsoever to the subcontractor. All of the subcontractors have accepted final payment without specific reservation of any rights against plaintiff. We have held that the prime contractor cannot recover for the benefit of its subcontractor when the prime contractor is not liable to the subcontractor for the damages caused by the defendant's breach. Continental Illinois National Bank & Trust Co. v. United States, 126 Ct.Cl. 631; Continental Illinois National Bank & Trust Co. v. United States, 101 F.Supp. 755, 121 Ct.Cl. 203, certiorari denied 343 U.S. 963, 72 S.Ct. 1057, 96 L.Ed. 1361, and the cases there cited.

The plaintiff contends, however, that the above exoneration clauses have been waived by the VA and that it agreed to reimburse plaintiff for the subcontractors' damages. Defendant never admitted liability to anyone for damages. The VA has paid what it thought was an equitable adjustment for the changes made. It has never admitted liability for anything more, nor has it ever admitted liability to the subcontractors.

Although plaintiff repeatedly advised the VA that it was going to hold the VA liable for damages caused to itself and its subcontractors, and presented the subcontractors' claims to the contracting officer and the head of the department, and is presenting their claims in this court, there is absolutely no evidence indicating that the plaintiff by so doing, or otherwise, waived the benefit of the exoneration clauses.

Plaintiff is not entitled to recover for the benefit of its subcontractors.

The plaintiff's claim in behalf of Pontiac Millwork Company, a supplier, has no relationship to the defendant's breaches of contract. Since this expense, if it is such, was not caused by the VA's breach of contract, no recovery is allowable on that claim.

4. We come now to the damages caused by the VA's breaches of contract. The plaintiff must prove its damages with reasonable certainty, but they do not have to be proved with absolute certainty. It is sufficient if plaintiff furnishes a reasonable basis for its computation, even though the result is only approximate. Eastman Kodak Co. of New York v. Southern Photo Materials Co., 273 U.S. 359, 47 S.Ct. 400, 68 L.Ed. 868; Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 51 S. Ct. 248, 75 L.Ed. 544; Palmer v. Connecticut Ry. & Lighting Co., 311 U.S. 544, 61 S.Ct. 379, 85 L.Ed. 336; Needles for Use and Benefit of Needles v. United States, 101 Ct.Cl. 535; First-Citizens Bank & Trust Co. v. United States, 76 F.Supp. 250, 110 Ct.Cl. 280; Reiss & Weinsier, Inc., v. United States, 126 Ct.Cl. 713, and the cases cited therein.

The plaintiff claims the difference between the original contract price for all the work, as increased by change orders, and its direct cost of completing

the job. Plaintiff's costs were $3,987,712.-50, and the contract price as increased by change orders was $3,575,123.40, a difference of $412,589.10. It also claims $40,846.61 as certain home office and field overhead. This is a total of $453,435.71. Plaintiff states that if the court finds against it on the wage claim, which we have, that $66,659.37 should be deducted from the $453,435.71. The plaintiff relies on Great Lakes Dredge & Dock Co. v. United States, 96 F.Supp. 923, 119 Ct. Cl. 504, certiorari denied 342 U.S. 953, 72 S.Ct. 624, 96 L.Ed. 708, and MacDougald Construction Co. v. United States, 122 Ct.Cl. 210.

This method of proving damage is by no means satisfactory, because, among other things, it assumes plaintiff's costs were reasonable and that plaintiff was not responsible for any increases in cost, and because it assumes plaintiff's bid was accurately computed, which is not always the case, by any means.

Our opinion in Great Lakes Dredge & Dock Co. v. United States, supra [96 F. Supp. 924], was not intended to give approval to this method of proving damage, except in an extreme case and under proper safeguards. In that case plaintiff had encountered unforeseen conditions and our problem was to determine the resulting equitable adjustment to which it was entitled, since the contracting officer had not made an equitable adjustment in the manner required by the contract. Article 4 of the contract provided that if unforeseen conditions were encountered, " 'any increase or decrease in cost' " should be adjusted. In that case we held that the adjustment should be based on the increase in cost under the actual conditions, and not on what might have been the increase if some other method had been employed to cope with the unforeseen condition. Approval was not given to proof of damages for breach of contract by showing the difference in plaintiff's bid and his costs on the entire job.

It is true we were forced in that case by the lack of other proof to compute the increased cost resulting from the unforeseen conditions encountered by taking plaintiff's actual costs incurred on account thereof and deducting therefrom certain costs for which plaintiff was responsible and then deducting from the balance the average of all bids and the defendant's estimate of the cost of the work. But by so doing we did not intend to give approval to proof of damages by showing difference of cost and bid on the entire job. In the MacDougald case substantially the same thing was done. In the Great Lakes case there had been no finding by the contracting officer, which had been made as the contract required, on the amount of the equitable adjustment.

Here the contracting officer has made a finding on the amount to which plaintiff is entitled as an equitable adjustment and this was done in the way the contract required. In such case, it is binding on us, unless it is not supported by substantial evidence. United States v. Callahan Walker Construction Co., 317 U.S. 56, 63 S.Ct. 113, 87 L.Ed. 49. It is not seriously contended that it was not.

There was not included in the amount found by the contracting officer any item covering damages for delay, but there is proof of these damages more reliable than the difference in plaintiff's estimate and its actual costs.

The evidence shows that the 159-day partial stop order caused 48 days' delay on the work under the original specifications. The plaintiff has satisfactorily proved its field office overhead and expense and the allocable portion of its home office overhead for this 48 days. This amounts to $15,309.12.

The plaintiff also claims, and the record shows, that it incurred expenses in an amount approximating $28,531.15 because the stop order prevented it from effectively and efficiently planning and coordinating its work on the project.

The plaintiff also claims, and has satisfactorily proved, that its field office overhead and expense and the allocable portion of its home office overhead between January 30, 1948, the date the job was accepted as substantially complete, and

May 24, 1948, were $13,281.62. These expenses were incurred while it was supervising the installation of equipment in building 19 that could have been installed before January 30, 1948, had the VA made up its mind within a reasonable time on the equipment that it wished to have installed.

Plaintiff is entitled to recover of the defendant a total of $57,121.89. Judgment for this amount will be entered.

JONES, Chief Judge, and LARAMORE, MADDEN and LITTLETON, Judges, concur.