## CONTINENTAL ILLINOIS NAT. BANK & TRUST CO. v. UNITED STATES.

### No. 45828.

United States Court of Claims.
Jan. 8, 1952.

756

Herman J. Galloway, Washington, D. C., for the plaintiff. King & King and Harry D. Ruddiman, Washington, D. C., were on the briefs.

William A. Stern II, Washington, D. C., with whom was Asst. Atty. Gen. Holmes Baldridge, for the defendant. Grover C. Sherrod, Washington, D. C., was on the briefs.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

MADDEN, Judge.

The plaintiff Bank and Trust Company, as the executor of the estate of Alfred N. Severin, has been authorized by the Probate Court of Cook County, Illinois, to act as liquidator of the partnership affairs of Nils P. Severin and Alfred N. Severin.

Both the Severins are deceased. During their lives they carried on a contracting business under the partnership name of N. P. Severin Company. The claims here in suit arise out of a building contract between the N. P. Severin Company and the United States. The Severin Company will be referred to hereinafter as the contractor.

On March 30, 1935, the contractor and the Government, which acted through the Federal Emergency Administrator of Public Works, entered into a contract for the construction of a low-cost housing project known as the University Housing Project at Atlanta, Georgia, for the sum of $1,984,-042.

### Claim for Cost of Inspector at Concrete Dry Batching Plant

Findings 15 and 16 relate to this claim. Briefly, the pertinent facts are these. Section 9 of Division VII of the specifications of the contract provided for the inspection of the contents of the concrete mix and the testing of the concrete for strength and other requisite qualities. It provided that the cost of the inspection and testing should be borne by the contractor. In fact, however, the Government would have had the inspection and testing done by its own employees without cost to the contractor if the inspection and testing could have been done on the site of the job. The plaintiff found it more economical and convenient to dry-batch the concrete mixture at the railroad siding where it received the ingredients from the railroad. This was two miles from the site where the construction was going on and the concrete was to be used. The dry mix was placed in mixing trucks and hauled to the job site where the water was added and the mixing completed. Because of the distance of the batching plant from the job site, the Government required the contractor to hire and pay an inspector, designated by an independent testing laboratory, who would inspect and approve the quality of each batch of concrete mixed at the batching plant.

We think the Government had the right to make this requirement. Under the terms of the contract, it would seem

that the Government could have required the contractor to pay for the inspection, even at the job site. The fact that it would not have done so did not put it under the additional burden of furnishing an inspector at the remote batching plant, where, whether busy with inspection of concrete or not, he could not do anything else that was useful to the Government. This claim of the plaintiff is not well founded.

### Claim for Delays

The completion of the construction was greatly delayed. The contract provided for a performance period of one year. That period was extended by 253 days by the Government's contracting officer for causes for which, he found, the contractor was not responsible. Thus the contractor was excused from liability for liquidated damages for these 253 days, though, as we shall see, it was assessed liquidated damages for a later period. The plaintiff claims that the Government was culpably responsible for much of the 253 days' delay, and that the plaintiff was damaged thereby, by having its job overhead and administrative expense continued when, but for the delay, it would have been through with the job.

The contract contained the usual Article 3, permitting the contracting officer to, within limits, make changes in the required work; Article 4 providing what should be done if unanticipated conditions were encountered; and Article 15 providing that disputes arising under the contract should be decided by the contracting officer, subject to an appeal by the contractor to the head of the department.

At the very beginning of the work, the contractor's excavation subcontractor was delayed for seven days while the contracting officer considered, and at last abandoned, an idea of raising the grades of all the buildings in the project. Then some days' delay was caused the subcontractor by the discovery that the Government's drawings of the grade elevations were erroneous. The contractor, at its own expense, had new and correct drawings made, but the plaintiff has not proved their cost and makes no claim for it.

When excavation for foundation footings began, unsuitable soil conditions consisting of soft ground and water, rubbish fills and old sewer lines and wells were encountered. Time was required for the Government to investigate these conditions and redesign the foundations. The contractor claimed that it was delayed 53 days, and it was allowed 33 days of excusable delay, on this account, when its extended completion date was fixed. We think that the Government is not required to pay the contractor's overhead losses caused by the encountering of these unanticipated conditions. They were not due to the fault of either party to the contract. Besides, the evidence shows that the plaintiff could have avoided the delay by planning its work better and going ahead on other parts of the site where there were no obstacles to progress.

Block B of the project consisted of a number of buildings, garages, and the boiler house for the project. Excavation for the boiler house was begun on October 14, 1935. On October 17 the contractor was instructed to stop work on the boiler house because it was going to be redesigned. Not until April 15, 1936, 175 days later, was the contractor permitted to proceed in accordance with the new design.

We think that the Government's taking 175 days for the redesign of the boiler house was inconsiderate of the harm which was being caused the contractor, and was a breach of the contract. The right reserved in the contract to make changes in the work does not mean that the Government can take as much time as it pleases to consider such changes, regardless of consequences to the other party to the contract. Brand Investment Co. v. United States, 58 F.Supp. 749, 102 Ct.Cl. 40, 44. We think that not more than 40 calendar days would have been, in the circumstances, a reasonable time for the redesign of the boiler house, and that the plaintiff may recover its job overhead and administrative expense, which we have found to have

averaged $207.79 per day, for the balance of 135 days, a total of $28,051.65.

## Liquidated Damages

■■ Article 9 of the contract and Section 10 of the specifications provided that the contractor should be assessed liquidated damages of $200 per day for lateness of completion of the project. The contracting officer excused, as we have said, 253 days of delay, thus fixing the completion date, as extended on December 30, 1936. On that date the project was reported by the Government's project manager to be 99.6% complete. But the Government would not "accept" it on that date, nor even on February 27, 1937, when it was 99.9% complete. As a consequence, the plaintiff was assessed liquidated damages at $200 per day from December 31, 1936, to March 17, 1937, 77 days, amounting to $15,400. The Comptroller General, in settling the contractor's account, excused 21 days of this time, thus reducing the liquidated damages by $4,200, to the sum of $11,200. The plaintiff sues for the $11,200. We think it is entitled to recover on this claim. Here again the question is whether the Government gave due consideration to the fact that there was another party to the contract, who would be hurt by inconsiderate action on the Government's part. Finding 51 shows that the work had been 99% complete since September 25, 1936; that it was 99.6% complete on December 30, as of which day liquidated damages began, and that the only work remaining to be done had to do with the boiler house equipment, and certain "punch list items" which are usually minor adjustments which recur for an indefinite time after the completion of an extensive building project. The boiler house work would, apparently, not have interfered with the occupancy of the houses by tenants, and tenants in new houses expect to be troubled for a while by adjustments due to tests. Two hundred dollars a day was a severe penalty for so slight an asserted delinquency and our observation of other cases tells us that it is not customary to draw the line so strictly. The refusal, which we hold unjustified, of the Government to accept the project on December 30, 1936, subjected the contractor, not only to the liquidated damages discussed above, but to continued expenditures for coal, light power and fire insurance in the amount of $2,454.75. The plaintiff may recover this amount.

## The Claims of the Subcontractor

All excavation work required by the contract was subcontracted by the Severin Company to Redmond and Collier, apparently a partnership. The contract of the Severin Company with the subcontractor provided: "23rd. The contractor or subcontractor shall not in any event be held responsible for any loss, damage, detention or delay caused by the owner or any other subcontractor upon the building; or delays in transportation, fire, strikes, lockouts, civil or military authority, or by insurrection or riot, or by any other cause beyond the control of contractor or subcontractor, or in any event for consequential damages."

■ The Severin Company was, therefore, under no liability to the subcontractor for losses suffered by the latter as a consequence of delays caused by the Government. A majority of the court is of the opinion that, for that reason, the Severin Company could not have recovered, and the plaintiff cannot recover any losses which the subcontractor may have so suffered. Severin v. United States, 99 Ct. Cl. 435; Continental Illinois National Bank v. United States, 81 F.Supp. 596, 112 Ct.Cl. 563. Judge Howell and the writer of this opinion take a contrary view, as we did in the Continental Illinois National Bank case, supra, where we relied upon United States v. Blair, 321 U.S. 730, 737–738, 64 S.Ct. 820, 88 L.Ed. 1039. In view of the court's conclusion that the plaintiff could not recover for the subcontractor's losses, if there were such losses due to the fault of the Government, we do not consider or decide whether there were such losses.

## Question of Adjudication by Departmental Action

As we have said, the contract here involved contained Article 15 which provided for the settlement of disputes by the con-

tracting officer, subject to the right of the contractor to appeal to the head of the department, whose decision should be final.

 The contractor made claims from time to time during the performance of the contract for extensions of time, and for allowances for losses. The Government suggested that the claims be held until the end of the contract, and said that, as to some of them, the contracting officer and the head of the department might not be authorized to settle them. The reference was, apparently, to claims for unliquidated damages for breach of contract. On October 20, 1937, the Government suggested that the contractor put its claims in order. On March 17, 1938, and by different communications thereafter, the contractor did so. On December 21, 1938, the Director of Construction Review of the United States Housing Authority advised the contractor by letter that an analysis of its claims had been made and that a statement of fact and a recommendation would shortly be forwarded to the General Accounting Office for final action. On February 23, 1938, the Administrator of the United States Housing Authority wrote the Acting Comptroller General a long letter including a discussion of the contractor's claims and his recommendation for their disposition. He requested the Acting Comptroller General to make a "direct settlement of this contract." A month later counsel for the contractor was sent a copy of the "findings of the administrator."

We think that most of the plaintiff's claims were not proper subjects of departmental decision under Article 15. It has been the position of the Comptroller General and the Executive Departments that they are not authorized to spend their appropriated money to pay claims for unliquidated damages for breach of contract. Further, we think that the Government did not follow the procedure of Article 15. There was no decision by a contracting officer from which the contractor could appeal to the head of the department. The only document which might be called a decision was that signed by the Administrator of the United States Housing Authority. He was, apparently, the head of the de-

partment. But Article 15, with its provision for a decision and an appeal, does not authorize the telescoping of these two steps into one. Still further, the Administrator did not purport to finally adjudicate the claims presented. He turned them over to the General Accounting Office for "direct settlement," and that office did, in regard to the assessment of liquidated damages, depart from the action which had been taken by the Housing Authority. We conclude, therefore, that what was done administratively with regard to the claims did not foreclose their litigation on their merits, and their adjudication in this court.

The plaintiff is entitled to recover $41,706.40.

It is so ordered.

JONES, Chief Judge, WHITAKER and LITTLETON, Judges, concur.