**CONTINENTAL ILLINOIS NAT. BANK**
**& TRUST CO. of CHICAGO v.**
**UNITED STATES.**

**No. 45741.**

United States Court of Claims.

Nov. 3, 1953.

Herman J. Galloway, Washington, D. C., for plaintiff. King & King, New York City, were on the briefs.

Carl Eardley, Washington, D. C., with whom was Warren E. Burger, Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and LIT-TLETON, WHITAKER and MADDEN Judges.

MADDEN, Judge.[1]

The plaintiff is the successor to each of the partners of the N. P. Severin Company, a partnership whose members are now deceased. The partnership, which will be called the plaintiff in this opinion, on June 22, 1935, entered into a contract with the United States, which acted through the agency of the Federal Emergency Administrator of Public Works. The contract was for the construction of a low-cost community housing project at Indianapolis, Indiana, which project became known as the Lockefield Garden Apartments. The contract price was originally $2,440,921, and was later reduced by change orders to $2,311,652.22. The contract provided that the work was to be completed with-in 400 calendar days after the receipt by the contractor of the notice to proceed. The notice was given on July 8, 1935, which made August 10, 1936, the completion date. For late completion, not excusable under the terms of the contract, liquidated damages of $250 per day were agreed to.

The contract was completed more than a year after the originally set completion date. The delay was excused by the officials of the Government, and no liquidated damages were assessed against the plaintiff. But the plaintiff asserts in this suit that the delays were not only excusable, so far as the plaintiff was concerned, but that most of the delay was caused by conduct of the Government which constituted breaches of contract on its part and thus rendered the Gov-

---

1. The opinion and findings of fact heretofore issued in this case on July 13, 1953, Ct.Cl., 113 F.Supp. 97, are vacated and withdrawn and this opinion and new findings of fact are substituted therefor.

ernment liable to the plaintiff for the damages which the plaintiff suffered because of the delays.

The delays involved in this suit fall into three categories: foundation delays, leaking wall delays, and delays by the Government in accepting the project when, the plaintiff claims, it was completed.

### Foundation Delays

The work contracted for consisted of the construction of 24 buildings, 8 of which were two-story row houses, 15 were three-story apartment houses, and one was a building containing twelve stores and some office space. The site covered some 22 acres, 5 blocks long and 3 blocks wide, from which slum dwellings had been cleared. There were on the site, as both parties knew when they made the contract, old streets and sidewalks, cesspools, cisterns, foundations and basements. The first work to be done was to excavate for the basements, foundations walls, and piers for the new buildings. The general excavation was done by machines. Then, at the foot of the foundations, and at the location of the piers, deeper excavation was done by hand so that concrete footings could be poured on which the foundations and piers would rest. This excavation had to go to solid ground, in order to make the foundations safe, and, because of the old basements, cisterns and cesspools which were on the site, places were encountered in nearly all the buildings where the hand excavation had to go to considerable depths in order to reach solid ground.

The plaintiff claims that the Government should have entrusted its agents on the job with the authority to determine when excavation to additional depths was required, and when a satisfactory depth had been reached, so that the work could go forward promptly, the amount of the additional excavation could be measured, the forms could be installed, the concrete footings poured, and the foundations and piers formed and poured. But, says the plaintiff, the Government's agents on the job were not

authorized to make these decisions. They were frequently required to communicate with their superiors in Washington, sending in sketches and waiting for instructions as to whether the conditions which they described were proper for construction. In the meantime, says the plaintiff, the work on the particular building was held up, it was necessary to move men and equipment to other buildings and later bring them back, and orderly and planned progress on the job as a whole was disrupted. The Government urges that not much disruption or delay was caused by the practices of which the plaintiff complains, and that such delay as there was was unavoidable under the terms of the contract. The Government points to Drawing B–326, which was a part of the contract and which contained the following note:

"All footings shall rest on original natural undisturbed bearing material which is assumed as follows:—Footings for Buildings # 1 to 8, East Wing of 11 and 13, and Garages—Clay. Footings for all other buildings—Gravel. In any case where the assumed bearing material is not found at the elevations shown, or old basements are not found in the exact location indicated, or any other contingency is encountered which might affect the assumed safe bearing value of the soil, or its future integrity as such, the Contractor, before executing any Foundation work, shall notify the Contracting Officer, who will consult with the Architect and issue instructions for the necessary adjustments. All changes of level of footings shall be constructed in detail as shown on Detail No. 40."

The contracting officer was in Washington. The Government's interest was twofold; first, to make sure that the excavation was carried to soil which was safe, and, second, to avoid unnecessary excavation because it had to pay for the excavation, and for the form work and concrete placed in it, as extras to the

contract. The Government says that if submission of these problems to the contracting officer took time and delayed and disrupted the plaintiff's work, nevertheless the plaintiff was required by the contract to endure the delay and disruption.

[redacted] We think that the contracting officer, who had authority to delegate to others his functions under the contract, was required by a decent consideration for the interests of the plaintiff, to authorize someone on the project to make these decisions. The problems were not difficult and the instances were numerous. The decisions in Washington were probably made almost entirely upon the basis of recommendations from the project manager and the architect, both of whom were in Indianapolis. The advantage to the Government in insisting upon the letter of the contract was so slight in comparison with the disruption and damage which was caused to the plaintiff by that insistence, that the Government's conduct amounted to a breach of the contract, when the contract is fairly construed. Indeed, by Change Order No. 1, issued by the contracting officer on September 25, 1935, and shown in our Finding 13, the project manager does seem to have been authorized to approve these changes in the death or design of footings. But even after this modification of the contract, many such problems were submitted to Washington.

[redacted] The extent of the delay caused by the Government's practices in regard to footing excavations is hard to determine. We can tell when the formal notices were given, but it seems that in many cases oral authorizations to the plaintiff to proceed were given, and the plaintiff did proceed, before the formal notice was issued. Then, too, there were strikes and bad weather which interrupted progress. Our best judgment is that the project was delayed 80 days by the Government's breaches of contract in regard to foundation changes.

Leaking Wall Delays

Above the foundations, the buildings were constructed as follows. A concrete slab, resting on the foundations and piers, constituted the floor of the buildings and the ceilings of the basements. The walls of the buildings above the foundations consisted of a single outer tier of brick laid flat and horizontally to the wall, with a header line of bricks constituting every sixth row. The back of the tier of bricks was parged with mortar. Behind the tier of bricks was a back up wall of Haydite blocks, of the same dimensions as cinder or concrete blocks, the appropriate row of blocks being so shaped that the header row of bricks extended back and were bonded over and to the blocks with mortar, thus tying the brick wall and the block wall together. There was no parging or waterproofing on the inside surface of the blocks, the plaster being placed directly on them. The ceiling of the first floor of the buildings, which was the floor of the second floor was another concrete slab, resting on the Haydite block walls and on interior piers or columns. The third floor of the three-story buildings was another concrete slab, as were the roofs of all the buildings.

[redacted] The brick work was done by a competent subcontractor and the work was, apparently, observed by the Government inspectors as it was done. The inspectors had no serious criticism of the brick work. But some months after the walls were constructed, serious leakage through the walls appeared whereever they were exposed to rain accompanied by wind. This problem turned out to be most distressing. Both the plaintiff and the Government searched for the cause or causes of the leakage. The Government blamed the leakage on faulty flashing, inadequate pointing of brick work, failure to fill the joints in laying the bricks and failure adequately to parge the backs of the tier of bricks or slush full the joints between the bricks and the Haydite blocks. The plaintiff, after extensive repointing and

completion of flashings, asserted that the leakage resulted almost entirely from faulty design of the buildings. The concrete slabs described above, which constituted the floors and roofs of the buildings, extended for the entire length and width of each building, with no joints to permit expansion or contraction. As we have said, they rested, at the perimeter of each building, on the Haydite block wall, and, inside the building, on the piers or columns. When the slabs expanded, they pushed the Haydite walls outward. Those walls were in contact with the brick walls which were, in consequence, also pushed outward. The brick walls had to give way at some point, and cracks resulted, some running in a straight course along the bricks and some running irregularly, in a jagged fashion. The mortar bond between the bricks was broken and access of water was possible. The contraction of the slabs had a similar effect, as did the lowering of the slabs where they rested on the piers, when the concrete in the piers cured and contracted. We are by no means certain that the Government's design, which resulted in the cracking of the walls, was the sole cause of the leakage, but we think that the weight of the evidence is to the effect that it was the principal cause.

█ The leaking walls caused serious delay and great damage to the plaintiff. The situation was so troublesome that for weeks at a time the work was practically at a standstill. If wooden floors were placed, they swelled and erupted, plaster was stained and spoiled, and hardware rusted. Our best judgment is that 42 days' delay were caused by the leaking walls, attributable to poor design, and that the plaintiff's work was damaged thereby.

#### Delay in Acceptance of Project

The specifications provided that when the work was practically completed the contractor was to give the contracting officer at least ten days' notice in writing of the date on which the work would be ready for final inspection. On July 1, 1937, the plaintiff gave notice that, unless circumstances beyond its control intervened, the project would be ready for final inspection on August 1. Before final inspection there was, apparently, so-called "punch-list" inspection. The plaintiff notified the Government's project manager when each building was ready for that preliminary inspection, which gave the Government the opportunity to list the asserted defects in the work which the contractor was obliged to correct. The Government was unreasonably dilatory in conducting the punch-list inspections, and in submitting its lists to the plaintiff. By this time the parties were in complete disagreement as to what defects the contractor was obliged to correct. The leaking walls had caused many defects, but the plaintiff took the position that the leaking walls were the responsibility of the Government, and that, therefore, the plaintiff was not obliged to repair the damage caused by the leakage. A consequence was that the plaintiff refused to make many of the corrections called for by the punch-lists, and made many other corrections under protest.

By September 1, 1937, the buildings were largely ready for occupancy except for the defects caused by the leaky walls. However, there was contract work still to be done, such as patching spalled ceilings, completion of the installation of refrigerators and medicine cabinets, placing window shades, repairing sidewalks, and cleaning and testing electric ranges.

Because of the dispute as to the responsibility for the defects resulting from the leaking walls, the Government never did accept the project as completed. The plaintiff continued to protect the buildings and to demand their acceptance by the Government. On December 17, 1937, the Government, still refusing to accept the project, terminated the plaintiff's contract and advised the plaintiff that it would cause the corrective work to be done and would charge the cost of it to the plaintiff. By later administrative proceedings, liqui-

dated damages for delay in completion were excused, and charges against the plaintiff for the costs of completion were largely eliminated. Those items are not involved in this litigation, except in connection with the defendant's counter-claim, which we find to be without merit.

■ We have concluded that the plaintiff's work was substantially completed as of September 15, 1937, and that the Government's delay in taking over the project as of that date was a breach of its contract.

The plaintiff's supervisory and other expenses were increased by reason of the delays described herein. Much remedial work was performed upon the buildings to correct the water damages and cracked walls prior to the time the defendant took over the project on December 27, 1937. Most of this corrective work was performed by plaintiff's sub-contractors.

■ The plaintiff's cost resulting from such delays and corrective work was $55,197.38.

### Claims on Behalf of Subcontractors

■ The plaintiff has included in its suit the damages alleged to have been suffered by numerous of its subcontractors because of the three kinds of delays discussed above. In Finding 76 we have set forth the names of each of the subcontractors involved and the provision appearing in each subcontract relieving the plaintiff from any liability to the subcontractor for delays caused by the Government. These exculpatory provisions are identical with the one involved in the case of Continental Illinois National Bank &. Trust Co. v. United States, 1952, 101 F.Supp. 755, 121 Ct. Cl. 203, certiorari denied, 343 U.S. 963, 72 S.Ct. 1057, 96 L.Ed. 1361, in which it was held that when a contractor has no liability to his subcontractor for damages caused by the Government, he cannot recover from the Government damages suffered by the subcontractor. The record herein contains evidence that substantial damages were suffered by the subcontractors because of the same faults of defendant which damaged the prime contractor. (Finding 77.) However, in view of the authorities cited above, the court has not weighed the evidence as to the nature and amount of such damages nor made findings with reference thereto.

### Finality of Administrative Action

The plaintiff urges that certain findings of the authorized agent of the head of the department, to the effect that the plaintiff had been damaged in the amount of $101,358.96, are binding upon this court, under Article 15 of the plaintiff's contract. The plaintiff relies on United States v. Wunderlich, 342 U.S. 98, 72 S.Ct. 154, 96 L.Ed. 113. The General Accounting Office, though it had requested these findings from the agent of the head of the department, refused to authorize the payment of the amount, because it involved claims for unliquidated damages which had to be determined by a court.

■ Though we have given great weight to the findings of the agent of the head of the department, because of the care and study which he seems to have devoted to the problem, we do not think that finality attaches to his findings. The departments are authorized to spend money only for the purposes for which it is appropriated by Congress. Funds are not appropriated to pay damages for breaches of contracts. The administrative findings made for the head of the department could not therefore be followed by administrative payment of the claim. We have held that such findings, adverse to the contractor, are not binding upon this court, since it would be unreasonable to construe Article 15 to authorize administrative officers to finally decide claims against contractors which they could not effectively decide in their favor. Anthony P. Miller, Inc., v. United States, 77 F.Supp. 209, 111 Ct. Cl. 252, 330.

The Defendant's Counterclaim

The Government has filed a counterclaim for the expenditures which it made in repairing the leaky walls and the consequences thereof, and for the maintenance of the buildings from the time they were taken over by the Government until they were occupied by tenants. These expenditures were not made necessary by any breach of duty on the part of the plaintiff. The counterclaim is therefore dismissed.

The opinion and findings of fact heretofore issued on July 13, 1953 are vacated and withdrawn and this opinion and the following findings of fact are substituted therefor.

The plaintiff may have a judgment for $55,197.38.

It is so ordered.

JONES, Chief Judge, and WHITAKER and LITTLETON, Judges, concur.