J. D. HEDIN CONSTRUCTION COMPA-
NY, Inc., for Its own Use and for the
Use of Fischbach & Moore, Its Sub-Con-
tractor

v.

The UNITED STATES.

No. 387–56.

United States Court of Claims.

June 11, 1965.

236

Thomas H. McGrail, Washington, D. C., for plaintiff. Gallagher & Thompson, Washington, D. C., of counsel.

Mary J. Turner, Washington, D. C., with whom was Asst. Atty. Gen., John W. Douglas, for defendant. Mary K. Fagan, Washington, D. C., on the brief.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS and COLLINS, Judges.

LARAMORE, Judge.

This action arises out of a contract between plaintiff and defendant's Veterans Administration for the construction of hospital facilities at Ann Arbor, Michigan. The contract was entered into by

the parties on August 24, 1949, and provided that construction was to be completed within 540 calendar days from the date of receipt of the notice to proceed (September 22, 1949). The project consisted generally of a 500-bed hospital proper and numerous appurtenant buildings and was not completed until July 31, 1953, which was 1,408 days after receipt of the notice to proceed and 868 days after the scheduled completion date. Although the contract provided for assessment of liquidated damages against the plaintiff for each day of delay beyond the original completion date, none were assessed by defendant. Moreover, the time for performance was extended by defendant from 540 days to 1,408 days.

Plaintiff contractor brings this suit on its own behalf and for the use and benefit of its electrical subcontractor, Fischbach & Moore, Inc., in which it charges defendant with a series of breaches of contract. The claims being prosecuted here are generally for delay-damages, primarily in the form of additional overhead, incurred as a result of the protracted performance time ensuing from defendant's various alleged breaches of contract, rather than for the cost of extra work. Plaintiff's delay-damages claims, aside from those of its subcontractor, can be generally grouped into three categories: (1) delays occasioned by defendant's faulty specifications and its tardiness in correcting such errors; (2) delays resulting from material shortages, abnormal weather, and strikes, which delays plaintiff claims would not have been encountered but for the original government-caused delays; (3) delays caused by a series of change orders issued during the final stages of the project, which plaintiff contends, taken collectively, were beyond the scope of the contract. Plaintiff also claims that defendant's breaches of contract with respect to the faulty specifications forced plaintiff's operations into periods of higher costs. Plaintiff seeks the increased costs incurred. Plaintiff, on behalf of its electrical subcontractor, asserts that the above enumerated government-caused delays stalled the subcontractor's operations, interrupted its normal sequence of work, and increased its cost of performance. The damages sought in this claim consist of the excess hours of labor caused by the delays, plus excess overhead. In defending on the merits, the government invokes a series of factual and legal propositions which it claims show that either the delays encountered were due to no fault of defendant or that as a matter of law plaintiff is not entitled to recover.

An extensive trial was held and in a complete and well-documented report our trial commissioner has found for plaintiff on most of the factual issues presented. The net of his report is that a vast majority of the delays encountered during performance of the contract were due to no fault of plaintiff. He has found that (1) the Veterans Administration not only was in error and negligent in preparing the specifications, but also unduly delayed in correcting the faulty design; (2) had it not been for the government-caused delays with respect to the faulty specifications, plaintiff would not have been delayed by material shortages, adverse weather, and labor strikes; (3) that as a result of the delays caused by defendant, plaintiff incurred additional costs described below.

As the case comes to us, defendant has the burden of showing that the commissioner was wrong in his factual conclusions. Such a task is far from slight since "[w]e start with the double directive that due regard must be given to the Commissioner's opportunity to judge the credibility of the witnesses and that his factual findings 'will be presumed to be correct.' Rule 48 [now Rule 66. That presumption is dissipated only by a strong affirmative showing." Davis v. United States, Ct.Cl. No. 179–59, decided February 14, 1964, slip op. p. 4. See also Litchfield Mfg. Corp. v. United States, Ct.Cl. 338 F.2d 94, decided October 16, 1964.

We have carefully examined defendant's numerous objections to the commissioner's report. There is some color of truth to defendant's contentions that

plaintiff's conduct with respect to the project left much to be desired. We think, however, that the genesis of the difficulties which were encountered was defendant's faulty specifications and its *undue* delay in correcting them. Whatever derelictions of duty plaintiff, as a contractor, might have been guilty of were not significant enough to counterbalance this initial government-caused difficulty. For this reason, we adopt the commissioner's evidentiary findings and factual conclusions with a few minor exceptions.

## I. FAULTY SPECIFICATIONS

Plaintiff's claims involve three separate alleged errors in design with respect to the government-drawn specifications to be used for the concrete piles, spread footings, and sewer system. Plaintiff contends that the defendant's faulty specifications, by themselves, establish a predicate for a breach of contract claim for the delays encountered as a result thereof. Moreover, plaintiff asserts that defendant's undue delay in correcting these errors in design establishes a separate basis for a breach of contract claim.

▆▆▆▆ It is well settled that where the government orders a structure to be built, and in so doing prepares the project's specifications prescribing the character, dimension, and location of the construction work, the government implicitly warrants, nothing else appearing, that if the specifications are complied with, satisfactory performance will result. E. g., United States v. Spearin, 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166 (1918); Laburnum Construction Corp. v. United States, 325 F.2d 451, 163 Ct.Cl. 339 (1963); Arcole Midwest Corp. v. United States, 113 F.Supp. 278, 125 Ct. Cl. 818 (1953); Stapleton Construction Co. v. United States, 92 Ct.Cl. 551 (1940). This rule rests on the presumed expertise of the government where it sees fit to prescribe detailed specifications. National Presto Industries, Inc. v. United States, Ct.Cl., 338 F.2d 99, 105, decided October 16, 1964, cert. denied 380 U.S. 962, 85 S.Ct. 1105, 14 L.Ed.2d 153 (1965). "This implied warranty is not overcome by the general clauses requiring the contractor to examine the site, to check up the plans, and to assume responsibility for the work until completion and acceptance." United States v. Spearin, supra, 248 U.S. at 137, 39 S.Ct. at 61 (Court footnotes omitted). Moreover, this implied warranty is not defeated by a contract clause permitting the prospective bidders to conduct independent subsurface investigations, if such explorations could not reasonably be completed before the bids were to be submitted. Fehlhaber Corp. v. United States, 151 F.Supp. 817, 138 Ct.Cl. 571, cert. denied 355 U.S. 877, 78 S.Ct. 141, 2 L.Ed.2d 108 (1957). However, an experienced contractor cannot rely on government prepared specifications where, on the basis of the government furnished data, he knows or should have known that the prepared specifications could not produce the desired result for " * * * he has no right to make a useless thing and charge the customer for it." R. M. Hollingshead Corp. v. United States, 111 F.Supp. 285, 286, 124 Ct.Cl. 681, 683 (1953). Cf., Flippin Materials Co. v. United States, 312 F.2d 408, 160 Ct.Cl. 357 (1963). If faulty specifications prevent or delay completion of the contract, the contractor is entitled to recover delay damages for defendant's breach of its implied warranty, and this breach cannot be cured by the simple expedient of extending the time of performance. Litchfield Mfg. Corp. v. United States, supra, 338 F.2d at 95. We will treat each of the alleged errors in the specifications separately.

### (A) *Concrete Piles*

The plans and specifications for the foundations, and in fact for the entire project, were prepared by the Structural Division of the Veterans Administration. These government-prepared specifications were based on subsurface investigations conducted for the Veterans Administration by the Interstate Engineering Company. These explorations disclosed that the soils at the hospital site were a glacial moraine, consisting of an ac-

cumulation of earth, stone, sand, silt, clay and gravel, with occasional boulders, and in some cases nested boulders. The boring logs showed a stratum of compact sand and gravel at varying elevations. They also confirmed the existence of highly resistant materials and boulders. On the basis of this information defendant prepared the specifications for the foundation piles.[1] The specifications required piles to be of the cast-in-place concrete type and were to be formed by one of three specified methods. Each of the three types of piles specified were to be encased within a thin steel shell of approximately 0.05 inch thickness. Piles were called for and used in about 90 percent of the building foundations.

The invitations for bids, specifications and drawings were issued to bidders on June 27, 1949, and provided for receipt of bids and bid openings on August 9, 1949. Drawings included logs of all borings and test pits, the manner in which they had been made, and the number of hammer blows required to penetrate the subsurface materials at various test locations. In short, the information submitted to the bidders contained all pertinent engineering data and information as to the pile-driving conditions that would be encountered at the site.

The plaintiff subcontracted the pile-driving operations to Western Foundation Corporation, an experienced pile-driving firm. The subcontractor arrived at the site on October 17, 1949 and promptly prepared its equipment and materials for the actual driving operations. The initial test pile was driven on November 8, 1949. This initial attempt proved unsuccessful. The driving was difficult resulting from the extreme compaction of the dense subsoil. It became apparent that the piles could not be driven "dry" through this extremely compact subsoil and the subcontractor had to resort to "jetting"[2] to loosen the soil so that the pile could be driven.

On November 16, 1949, the preparations for "jetting" having been accomplished,[3] three piles were driven in a satisfactory manner with the aid of "jetting". On the next day, three additional piles were driven but this caused the three piles driven on the day before to collapse or otherwise become unsatisfactory. On the next day a final pile was driven causing the three piles driven on the prior day to become unsatisfactory. Only the last pile of the seven was satisfactory. The cause of this difficulty was the fact that the thin-shelled piles could not withstand the actual pressures exerted from the driving of subsequent piles. Thus, only the last pile driven would remain satisfactory.

On the basis of these driving results, it became apparent that the thin-shelled piles were inadequate for the job, and defendant's superintendent in charge of construction at the project site so advised the Veterans Administration in Washington on November 18, 1949. Moreover, he informed the Veterans Administration that the pile-driving operations were suspended pending its decision and requested that a representative from Central Office be delegated immediately.

Thereafter, the piling subcontractor attempted to drive the specified thin-shelled piles in other areas to ascertain whether the subsoil conditions encountered in the driving of the first series of piles prevailed throughout the area. Ef-

1. Defendant had not driven any test piles as a part of its investigation of subsurface conditions. This idea was rejected because of the cost involved, i.e., $10,000.

2. "Jetting" is a method sometimes used when the driving of a pile "dry" is not possible because of factors such as extreme compaction of the soil. In such a situation, the jetting of a thin stream of water under very high pressure will loosen the soil so that the pile can be driven. However, this procedure is used as a last resort, when no other alternative exists, because of the unfavorable soil conditions created by the water.

3. Defendant contends that plaintiff unreasonably delayed in providing the subcontractor with water so that "jetting" could be accomplished. The record does not support such a contention.

forts to drive these additional thin-shelled piles also proved unsuccessful.

As of November 30, 1949, defendant had taken no action to correct these difficulties. On that date the piling subcontractor proposed, as a solution to the problem, the use of a heavy steel pipe pile with a one-quarter inch wall, as distinguished from the 0.05 inch wall required in the specifications. On December 6–7, 1949, several of the heavy steel pipe piles were successfully driven and a representative of defendant, who observed the driving, was satisfied that the heavier pile would be satisfactory. It was not until January 17, 1950, that defendant issued Change Authorization No. 3, which authorized plaintiff to proceed with the driving of the heavy steel piles. Thereupon Western Foundation prepared its equipment for the driving of the heavier steel piles, shipped to the construction site the duly authorized pipe pile, and accomplished the necessary preparatory work. Pile-driving operations resumed on February 3, 1950, and were substantially completed by May 16, 1950. Western Foundation took 59 driving days or 102 calendar days to place the heavier piles.

On January 30, 1951, defendant unilaterally issued Change Order PP increasing the contract price by $163,046 and extending the contract time by 125 calendar days for installation of the heavy pipe pile in lieu of that originally specified. The price increase of $163,046 provided $151,671 for the subcontractor and allowed seven and one-half percent of that figure, namely $11,375, for plaintiff as the "General Contractor Fee." Plaintiff appealed the change order claiming that it was entitled to recover increased costs incurred as a result of the change in the pile specifications. The appeal was denied. With respect to the pile difficulties, plaintiff not only seeks delay damages in the form of increased overhead, but also claims that it is entitled to recover its increased costs incident to the foundation change.

As stated earlier, plaintiff contends that the defendant's faulty specifications, by themselves, establish a predicate for a breach of contract claim for the delays encountered as a result thereof. Moreover, plaintiff asserts that defendant's undue delay in correcting these errors in design establishes a separate basis for a breach of contract claim.

■ There is no doubt in our minds that under the originally specified piles satisfactory performance would not have resulted. Defendant's own employees admitted this.[4] However, this by itself does not constitute a breach of the implied warranty. The government first contends that the necessity to revise the specifications for the pile foundations resulted from changed conditions encountered at the site rather than faulty specifications. It then argues that if latent conditions eventuate, a contractor can recover only under the "Changed Conditions" clause and is prevented from seeking breach of contract damages. The government also argues that plaintiff's failure to conduct an independent subsurface investigation, coupled with the contract provision in which the government does not guarantee the correctness of the explorations, absolves it from the representations made in the specifications. In this connection, defendant also contends that plaintiff's failure to inspect the additional exploration data it had in Washington prevents it from relying on the specifications.

■ Defendant's first contention that the change in specifications resulted from changed conditions rather than faulty specifications is not supported by the record. Moreover, defendant's argument in this respect appears to be inconsistent with its prior position in this

---

4. Defendant's superintendent recognized this when he wrote Central Office on November 18, 1949. The Chief of Veterans Administration Structural Division, in his memorandum of January 10, 1950, recognized that the piles as originally specified could not be properly driven. See also finding 33.

litigation.[5] But more importantly, defendant does not at any place in its brief state just what the changed conditions were. The density of the subsoil and existence of highly resistant materials were known at the time the specifications were drawn. These were the exact conditions which were encountered and prevented the thin-shelled piles from being driven properly. It appears to us that the necessity for the change resulted from defendant's failure to properly evaluate the *known* subsurface conditions.

The fact that plaintiff did not conduct an independent subsurface investigation is not determinative in this situation. Our commissioner has found that the period of 43 days between invitations to bid and the opening of bids was not sufficient time for bidders to duplicate or make any adequate investigation of subsurface conditions. This factor alone would absolve plaintiff from this duty since we cannot impose an obligation on a contracting party which cannot reasonably be performed. Fehlhaber Corp. v. United States, supra. Moreover, an independent investigation would have disclosed exactly the same conditions which defendant had found. For this reason too, the government's disclaimer as to the results of the explorations has no application here. The difficulties encountered did not stem from unknown subsurface conditions, *but* were directly attributable to defendant's failure to properly evaluate the known subsurface conditions in designing the specifications for the piles. Here the government chose to exercise its presumed expertise and thus impliedly warranted that satisfactory performance would result. As we said before, the thin-shelled piles orginally selected for this project proved to be unsatisfactory since they could not be driven properly. This con-

stitutes an error in the specifications which establishes a predicate for a breach of the government's implied warranty. Morrison-Knudsen Co. v. United States, Ct.Cl., 345 F.2d 833 decided May 14, 1965.

However, the government can still escape liability for this error in design if it can prove that, based on the information which it made available, plaintiff could have determined that satisfactory performance under the specified piles would not result. R. M. Hollingshead Corp. v. United States, supra. See also Flippin Materials Co. v. United States, supra. In support of this exculpatory rule defendant contends that had plaintiff inspected the materials which were made available to it in defendant's Veterans Administration office in Washington, D. C., this error in design would have been detected. However, defendant not only has failed to prove specifically what materials it had in Washington but, more importantly, we are not told how these materials would have put plaintiff on notice of the errors in design. For these reasons, the exculpatory rule of Hollingshead and Flippin has no application to the instant case and does not present an obstacle to plaintiff's recovery.

There remains the question of causation. The government argues that the delays which resulted were not due to the faulty specifications but were directly attributable to plaintiff's inefficient engineering practices. It is well settled that the government is relieved of liability irrespective of its faulty specifications, where the actual delays were occasioned by factors outside the government's control. United States v. Howard P. Foley Co., Inc., 329 U.S. 64, 67 S.Ct. 154, 91 L.Ed. 44 (1946); United States v. Blair, 321 U.S. 730, 64 S.Ct. 820, 88 L.Ed. 1039 (1944); United States v.

---

5. The contention of changed conditions was raised for the first time by defendant in its reply brief. In defendant's proposed finding 70(b) it requested the commissioner to find that "[p]rior to the submission of its bid, plaintiff had adequate notice of the conditions which it subsequently encountered and which were not such as to constitute changed or latent subsurface conditions within the terms of the contract."

Rice, 317 U.S. 61, 63 S.Ct. 120, 87 L.Ed. 53 (1942). Such a determination is strictly a factual one within the province of our trial commissioner, subject to review by the court, based on the standards set out above. In the evidentiary record made in this case, there is much to support the commissioner's determination that the delays encountered resulted from defendant's errors in design and were not caused by plaintiff's alleged inefficient engineering practices. These contentions are merely reiterations of those made to the commissioner. We think that they have been adequately answered by our commissioner in his report, and we accept his conclusion that "[t]he evidence does not support these contentions," and the primary cause of the foundation delays was defendant's faulty specifications.

Under these circumstances, we hold that defendant breached its implied warranty for which plaintiff is entitled to recover delay-damages as a result thereof.

We turn now to a determination of the extent of the government-caused delays. Our commissioner has found that the government-caused delays, with respect to the pile difficulties, amounted to 125 days. Defendant challenges this finding by asserting that the delays encountered primarily resulted from plaintiff's job methods. We start with the proposition that defendant, by extending the time of performance 125 days, recognized that the overall project was delayed to that extent. The grant of an extension of time by the contracting officer carries with it the administrative determination (admission) that the delays resulted through no fault of the contractor. Cf., Langevin v. United States, 100 Ct.Cl. 15, 30 (1943). However, this does not mean that where "the Government refrains from exercising its right to collect liquidated damages [by extending the time of performance], though that forbearance may tend to raise some question of government-caused delay, it is * * * tantamount to admitting liability for breach of contract * * *." Robert E. Lee & Co., Inc. v. United States, Ct.Cl. No. 252–60, decided January 24, 1964, slip op. p. 4. It is up to this court to determine the extent of the delay for which defendant is responsible. Schmoll v. United States, 63 F.Supp. 753, 759, cert. denied, 329 U.S. 724, 67 S.Ct. 69, 91 L.Ed. 627, 105 Ct.Cl. 415, 458 (1946). However, "[t]he findings of the contracting officer have been said to constitute a strong presumption (James Stewart & Co., Inc. v. United States, 63 F.Supp. 653, 105 Ct.Cl. 284 (1946); Irwin & Leighton v. United States, 101 Ct.Cl. 455 (1944) or an evidentiary admission (George A. Fuller Co. v. United States, 69 F.Supp. 409, 108 Ct.Cl. 70 (1947)) of the extent of the Government's liability, but always subject to rebuttal." Robert E. Lee & Co., Inc. v. United States, supra, slip op. pp. 4, 5. We think that defendant has not rebutted this presumption.

It is clear to us that no productive work was being accomplished from November 8, 1949 (date on which the first pile was unsuccessfully driven) to February 3, 1950 (date on which the driving of the heavy pile commenced). During this period plaintiff's efforts were directed at resolving the problems ensuing from the defective plans and specifications. The status of the work was the same on February 3, 1950, as it was on November 8, 1949. This amounts to 87 days in delays for which the government is responsible. Moreover, we find that the government caused the additional 38 days covered by the extension of time. The driving of the heavier pile was attended by numerous difficulties which would not have been encountered had the original delay not ensued. By an earlier completion date, plaintiff would have been able to avoid pile driving operations during the spring of 1950 when muddy conditions at the site slowed down performance and made it more difficult. The government is responsible for these delays. An exact amount cannot be determined since some productive work was being done during this time. However,

because of these conditions, progress was at a slower rate.[6] Moreover, since pile driving was the first step in the construction of the building, the resulting delays caused an overall project deterioration. We have the contracting officer's determination of 125 days. Defendant has failed to show any action by plaintiff which caused delay. The presumption of the extent of the government's liability has not been rebutted. Therefore, we hold that 125 days was the extent of the government-caused delays with respect to the faulty pile specifications.

 As stated earlier, plaintiff seeks not only damages as a result of the delays caused by defendant's faulty pile specifications, but also seeks its increased costs incurred as a result of the change in the specifications. Under Change Order PP, defendant unilaterally allowed increased costs to the pile subcontractor. Plaintiff appealed this decision of the contracting officer claiming that it was entitled to be reimbursed for the increased costs it incurred as a result of the change. The Board upheld the contracting officer's determination. A *de novo* trial was held on this issue, without any objection by the defendant that a determination of this issue be limited to a review of the administrative proceedings based on the Supreme Court's ruling in United States v. Carlo Bianchi & Co., Inc., 373 U.S. 709, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963). Whatever might have been defendant's right to limit this issue to a review of the administrative record, had the issue been timely raised, we hold, as we have before, that in this case defendant waived any such right by failing to object. WPC Enterprises Inc. v. United States, 323 F.2d 874, 163 Ct.Cl. 1 (1963); Stein Bros. Mfg. Co. v. United States, 337 F.2d 861, 162 Ct.Cl. 802 (1963). Plaintiff argues that the damages here sought flow directly from defendant's breach so that recourse to the administrative board on

its findings is not necessary. We need not decide this issue since we find that insofar as the decision of the Appeals Board involved factual issues within the "Disputes" clause, the Board's decision is not supported by substantial evidence and is, therefore, overturned.

As a result of the delays ensuing from the pile difficulties, plaintiff incurred costs on the foundation work in excess of those costs it would have sustained had the delays resulting from the changes not occurred. By an earlier completion date of the pile-driving operations plaintiff could have avoided added work which became necessary. During the period the excavations were open, especially after the middle of March 1950, rain, snow, and the freezing and thawing of the ground, caused the banks of the excavation to erode. Some footings had to be re-excavated because of sloughing-in, additional backfill became necessary, more form work and grading was needed, and there were additional costs for labor and pumping of water from the excavations.

 We think that plaintiff should be entitled to be reimbursed for this excess cost. Whether they flow directly from the defendant's breach, or are in the form of an equitable adjustment resulting from the change in specifications, is immaterial in this case— the amount would be the same. Our commissioner has found that plaintiff incurred excess costs incident to the foundation work in the amount of $86,621.15. We think this amount is reasonable under the circumstances and we accept it.

 Defendant challenges the manner in which these costs were computed by arguing that the commissioner's report erroneously accepts the "total cost" theory expressly rejected by us in River Construction Corp. v. United States, 159 Ct.Cl. 254 (1962) and in F. H. McGraw & Co. v. United States, 130 F.Supp. 394, 131 Ct.Cl. 501 (1955). We

6. As of the middle of March 1950, pile driving was about 80 percent completed, at a driving rate of 200 piles per week. The remaining 20 percent of the piles (340) took eight weeks.

are aware that we have on a number of occasions expressed our dislike for this method of computing breaches of contract damages, and we do not intend to condone its use as an universal rule. However, we have used this method under proper safeguards where there is no other alternative, since we recognized that the lack of certainty as to the amount of damages should not preclude recovery. Oliver-Finnie Co. v. United States, 279 F.2d 498, 150 Ct.Cl. 189 (1960); MacDougald Construction Co. v. United States, 122 Ct.Cl. 210 (1952); Great Lakes Dredge & Dock Co. v. United States, 96 F.Supp. 923, 119 Ct.Cl. 504 (1951), cert. denied 342 U.S. 953, 72 S.Ct. 624, 96 L.Ed. 708 (1952). In all these cases the fact of government responsibility for damages was clearly established; the question was how to compute reasonable damages where no other method was available. River Construction Corp. v. United States, supra, 159 Ct.Cl. at 271. We think this is such a case. The exact amount of additional work which plaintiff had to perform as a result of the foundation problem is difficult, if not impossible, to determine because of the nature of the corrective work which was being performed. The adverse weather conditions during the extended period in which the excavations remained open caused a myriad of problems. Additional trenching, form construction, and pumping of surface water became necessary. Re-excavation by hand was sometimes required. The extreme muddy conditions caused difficulties and slowed down performance. There is no precise formula by which these additional costs can be computed and segregated from those costs which plaintiff would have incurred if there had been no government-caused difficulties. However, the reasonableness and accuracy of plaintiff's estimate, which was prepared by an experienced engineer whose qualifications have been unchallenged, have been established. Defense counsel stated that the estimate was not challenged. The closeness of the bids gives support to the reasonableness of the estimate. The bidders were three extremely experienced contractors of large construction projects. Plaintiff on prior occasions had successfully constructed a number of large projects for the Veterans Administration. Plaintiff has established the fact that it performed additional work. Moreover, the responsibility of defendant for these damages is clear. The only possible method by which these damages can be computed is by resort to the "total cost" method. Under such circumstances, as stated earlier, we think that the government should not be absolved of liability for damages which it has caused, because the precise amount of added costs cannot be determined.

Defendant contends that a nationwide steel strike would have delayed structural steel delivery to the job until approximately the time when pile driving had been completed and the job was ready for steel. It argues that the steel strike would have caused a job delay irrespective of the pile foundations. It introduced no evidence of the date and length of the strike and relies only on a letter from plaintiff to the contracting officer in which the contractor sought an extension of time for structural steel shortages arising from the strike. The steel strike which defendant refers to started on October 1, 1949, and affected all major steel producers. Settlements were made by most all of these companies by November 11, 1949. We have said that pile operations with the thin-shelled piles could have been reasonably completed by February 1, 1950. Thus there was a two and one-half month interval before structural steel would have been needed on the job, if on original schedule. Moreover, there is no evidence that there would have been an *actual* overall job delay as a result of the strike. The strike delay is only theoretical at best, whereas defendant's delays were actual. Under such circumstances, we think the government should not be absolved of liability and the innocent party penalized as a result of a fortuitous circumstance, the effect of which cannot be determined with a reasonable approximation.

## (B) *Spread Footings*

The nature of the soil governs whether piles or spread footings are appropriate for foundations. The Veterans Administration determined in its contract drawings that spread footings were to be used as foundations in two wings of the hospital building. They were also to be used as foundations in several other structures.

Spread footings are blocks of concrete of various sizes. They are created by pouring concrete into designed excavations at predetermined elevations. Defendant in the contract drawings specifically set forth the elevations where each of the spread footings was to be placed. Generally the footings were to rest six inches below the gravel strata found in the subsoil at the site. In preparing for the pouring of such footings, the ground is excavated to the top of the gravel strata and then the bed for the footings is dug by hand.

On December 8, 1949, while excavating for the footings, plaintiff did not hit the gravel strata at the elevations indicated on the drawings. Defendant's project superintendent was made aware of this situation and on that date notified, by telegram, Central Office of the Veterans Administration of this discrepancy. On January 1, 1950, having received no response to his telegram, the project superintendent again advised Central Office that the gravel stratum was at a deeper elevation than shown on the drawings and added that a reply was badly needed. During the interim, on December 13, 1949, the plaintiff also called this situation to the contracting officer's attention and asked for instructions. Plaintiff received no reply.

Finally, on January 9, 1950, defendant's project superintendent received a memorandum from the Central Office wherein detailed instructions were given with respect to the difficulties arising from the spread footings. The memorandum specified the method for the lowering of those footings which were to be lowered less than two feet, and stated that in respect to footings to be lowered more than two feet, the elevation of the gravel strata should be submitted first before a lowering would be authorized. The memorandum also directed the superintendent to obtain a proposal from the contractor covering the cost involved in lowering the spread footings. This request appeared to be extremely impractical, if not impossible, since in defendant's project superintendent's words, "the number of footings and the amount that each must be lowered is indeterminate until such time as all footings have been installed." Moreover, the requirement that plaintiff excavate down to the gravel level seems extremely impractical. If plaintiff were to do this, then the excavations would be left open awaiting a decision and this would cause, as defendant's project superintendent recognized, "excessive caving and reexcavation." Accordingly, a per-foot proposal was suggested by defendant's project superintendent whereby plaintiff would be paid the agreed price times the number of feet that each footing would have to be lowered.

At this juncture it is important to point out that plaintiff could not construct the spread footings in accordance with the plans and specifications. Plaintiff promptly notified defendant of this fact. It was incumbent upon defendant to revise the faulty plans or issue a change order authorizing plaintiff to do the necessary exploratory work to determine the exact elevations of the gravel strata. It was not plaintiff's obligation under the contract to determine the existing conditions and revise the contract drawings. A change order or proceed order which would assure plaintiff compensation is necessary before defendant can impose this obligation on plaintiff. Cf., Fox Valley Engineering Inc. v. United States, 151 Ct.Cl. 228, 241 (1960); MacDougald Construction Co. v. United States, 122 Ct.Cl. 210, 256 (1952). It was up to the defendant to take the next step in correcting the defective plans. The only thing that could be required of plaintiff would be a proposal of the

cost of lowering footings on a per-foot basis.

Nevertheless, defendant persisted in requiring plaintiff to provide the elevations where footings were to be lowered more than two feet below the contract elevations, before a change was authorized. Plaintiff was also requested to submit a lump-sum proposal instead of the unit price per additional foot originally suggested by defendant's superintendent. Plaintiff was so advised by letters dated February 13, 1950, and February 28, 1950.

The lump-sum proposal was submitted on March 7, 1950, and on March 17, 1950, plaintiff submitted the elevations. Change Authorization No. 6, accepting plaintiff's proposal of March 7, 1950, was not issued, however, until April 25, 1950.

In some areas, the gravel stratum was located so much lower than shown on the contract drawings (in some instances 15 to 20 feet) that spread footings actually could not be used, and it became necessary to redesign for the use of pile foundations. Defendant's superintendent advised the Central Office of this fact on March 29, 1950. Defendant took no action. Again, on May 15, 1950, the defendant's superintendent advised the Central Office that if piles were going to be used in lieu of spread footings, such a determination should be made quickly because pile driving was to be finished the following day and there would be increased costs for moving the driving equipment back to the location when once removed. It was not until June 1, 1950, that defendant authorized the substitution of pile footings for the spread footings.

Plaintiff has been fully recompensed for the actual additional work directly involved in lowering the spread footings and substituting the piles, and only seeks delay-damages measured by the time extensions allowed by the contracting officer on the grounds that defendant breached the contract when it provided faulty specifications with respect to the spread footings.

There is no doubt in our minds that the government-prepared specifications contained errors with respect to the elevations of the gravel strata. That this constitutes faulty specifications and establishes a predicate to a breach of contract claim is clear. The government defends on the grounds that the job delay was not caused by the faulty specifications but was attributable to plaintiff's failure to promptly determine the actual elevations. The short answer to this, as we have indicated above, is that defendant could not impose on plaintiff such a duty without first authorizing a change order or a proceed order assuring plaintiff compensation for this work which was beyond the scope of the contract. Fox Valley Engineering Inc. v. United States, supra; MacDougald Construction Co. v. United States, supra. Defendant cannot now charge plaintiff with being dilatory with respect to an obligation which it had no right to impose. Moreover, the record indicates that plaintiff was, under the circumstances, reasonably prompt in submitting to defendant the requested information.

We turn now to a determination of the extent of the government-caused delay. As we have indicated with respect to the pile difficulties, the grant of an extension of time not only is a determination that the project was delayed to that extent, but also is an administrative admission that the delay was through no fault of the contractor. There is a failure of proof that the delays were occasioned by factors beyond the control of the government. See Litchfield Mfg. Co. v. United States, supra. Under such circumstances, the presumption as to the extent of the government's liability has not been rebutted. Thus, we hold that the government-caused delays with respect to the spread footings amounted to 45 days.

(C) *Sewers*

The specifications provided for permanent drainage of the buildings and site by sewers. On the east side of the site, the storm sewers were to run into a 15-

inch storm sewer. On the west side the sewers were to drain into a 10-inch trunk line which flowed into an outlet near the southwest corner and thence the discharge was to be through a manhole and off-site culverts. A 30-inch storm sewer approximately 230 feet in length was also to be constructed on the west side of the site.

Plaintiff subcontracted the work for the sewer system. This work was scheduled to be completed during the early stages of the project so that fill from the excavations of the buildings could be placed over the sewer lines and the area graded for roads and parking areas. It was also necessary that the 15-inch and 30-inch storm sewers be constructed during the first months of the construction in order that the other utility lines which ran over or across the sewer system could be installed. The soil at the east and west sides of the site where the 15-inch and 30-inch sewer lines were to be constructed was extremely "swampy" thus necessitating up to 15–18 feet of fill. Laying of the 15-inch storm sewer line at the east side of the site began on November 1, 1949. The unstableness of the soil in this area caused the subcontractor to experience extreme difficulties in the installation of the sewer lines. It appears that the subsoil in that area could not support the weight of the pipe and fill upon it. Laying of the 15-inch line was completed on November 28, 1949, but it still was not stable.

On November 30, 1949, plaintiff proposed to the contracting officer, as a solution to this problem, the removal of the unstable soil in the path of the 15-inch sewer line and replacement of it with coarse gravel. Defendant's contracting officer failed to reply to plaintiff's proposed solution.

On January 24, 1950, defendant's superintendent advised plaintiff that, in view of the unstable soil conditions in the vicinity of the 15-inch line, further installation at the east end of the site should be suspended. The letter advised plaintiff that the 15-inch line as laid was not acceptable as it had dropped, heaved, and was out of line due to the unstable soil condition. He further indicated that it would be necessary to remove the line and put it on a firm foundation by a method to be determined by defendant.

Placing of the 30-inch concrete sewer pipe on the west side of the site began on November 2, 1949, and continued until November 8, 1949, when defendant's superintendent ordered that any further work on the line be suspended because of a sink hole encountered along 75 feet of the trench. He described the condition as "a bog with a very soft muddy bottom which seems bottomless." He thought it would be necessary to put the pipe on a concrete mat or reroute the line. The condition encountered was at once communicated to the Central Office of the Veterans Administration. On November 9 and 15, 1949, plaintiff advised the contracting officer that in accordance with the directions of defendant's superintendent it had stopped work on the 30-inch line until a decision was made by defendant. Plaintiff also indicated that a decision was needed since this stoppage was holding up work of excavation, fill, grading, and installation of other lines.

On November 14, 1949, defendant's superintendent proposed to plaintiff that the sink hole in the area of the 30-inch sewer line be dug out and filled with coarse gravel. He also submitted a drawing specifying the manner of doing the work and requested from plaintiff a proposal on costs. Plaintiff submitted the requested proposals on December 5 and 27, 1949. No action was taken thereon by defendant's Central Office.

Plaintiff, without waiting for approval of its proposals, dug out the sink hole and replaced the excavated materials with gravel. Backfill two feet deep was placed on top of the pipe to prevent lateral movement. However, this was unsuccessful and defendant's superintendent so advised the plaintiff on January 24, 1950, with instructions to plaintiff not to proceed further with the installation. He also indicated that the matter had been

referred to Central Office for a determination of a solution to this problem.

On February 15, 1950, defendant's superintendent requested the plaintiff to submit a proposal covering the amount of corrective work necessary to install the 15- and 30-inch lines and manholes in a stable position. The plaintiff replied on February 23, advising defendant that the proposal would be submitted as soon as the drawings, previously promised, showing where the sewer was to be changed from clay to concrete pipe, were supplied.

On March 9, 1950, defendant's superintendent wrote plaintiff providing general information on methods to be used in correcting the sewer problems. The letter requested a proposal for a concrete slab to be placed on the gravel pile already in place beneath the 30-inch sewer line. As to the 15-inch line, alternatives were suggested of either (1) sheeting the tile underdrain, with the sewer line to be of cast-iron pipe, or (2) setting cast-iron sewer pipe or creosoted wooden piles with the pipe itself anchored to a pile cap. On April 3, 1950, plaintiff submitted its proposal in response to defendant's request of March 9, 1950. It also advised defendant that all of the cast-iron pipe had to be ordered. No action was taken by defendant on plaintiff's proposals.

In May and June of 1950, plaintiff protested to defendant in writing the indecision and delay by defendant in responding to plaintiff's proposal. The grading and plumbing subcontractors were protesting the delay to plaintiff.

During the months of May, June and July of 1950, defendant's superintendent reported, in his daily report submitted to Central Office, that the failure of the Central Office to arrive at a final decision in regard to the sewer installation was causing the subcontractor additional expense. He observed that if the work had to be carried over until the spring and summer of 1951, it would interfere with roads, walks, grading and drainage work and prolong the entire project.

Finally, on July 25, 1950, defendant issued Change Authorization No. 13 permitting a change, where required in the judgment of defendant's superintendent, from clay or concrete pipe to cast iron for the storm and sanitary sewers. Supporting piles were authorized for the pipe and manholes in the eastern part of the work, and the 30-inch pipe on the western side was to be supported by a concrete slab. The obligation of the government for the changes was limited to $45,-000 by the change authorization. By letter of the same date, defendant's superintendent gave to plaintiff his decision on those places where cast-iron sewer pipe should be used.

On August 3, 1950, plaintiff acknowledged receipt of the change authorization of July 25 and advised defendant that during the months intervening between its proposals and the change authorization (April 3 to July 25) the cost of performing the work had materially increased and that delivery of the cast-iron pipe could not be made by the supplier until November 15, 1950. Plaintiff also requested the defendant to advise it as to "what means, what type of pipe you now desire a quotation on inasmuch as cast iron pipe is unavailable." Plaintiff then stated that it protested the change authorization. Defendant did not reply to plaintiff's letter.

Having received no reply or further instructions from defendant, the plaintiff, on August 31, 1950, wrote defendant regarding the change authorization of July 25, 1950, and requested that it be permitted to proceed with the 30-inch line portion of the sewer, inasmuch as the lack of available cast-iron pipe only affected the 15-inch line. Defendant did not reply to plaintiff's request.

On September 1, 1950, plaintiff again wrote the defendant and submitted correspondence from its sewer subcontractor and suppliers indicating that cast-iron pipe delivery was indefinite. Plaintiff again protested the continued delay and advised defendant that the job was "now in a deplorable condition" requiring construction of temporary roads so

work could proceed during the rainy season. Plaintiff then noted his appeal of the change authorization, although expressing the view that a change authorization was not a change order under the contract and that it had never received any orders in respect to the sewer lines. Defendant did not reply to this letter.

Plaintiff wrote again on September 29, 1950, and advised defendant that there were several thousand yards of excavated materials stockpiled which now had to be rehandled for a second time. Plaintiff then requested "immediate action so sewers and water lines * * * [could] be installed without any further delay." Defendant did not reply to plaintiff's urgent requests.

Finally, defendant's contracting officer issued Change Order T on October 23, 1950, and for the first time directed that the corrective sewer work be done at a cost not to exceed $75,000. Plaintiff thereupon attempted to get a definite commitment on delivery of cast-iron pipe but had difficulty in doing so. On December 7, 1950, plaintiff submitted to defendant for approval a description of the pipe it would be able to obtain, and defendant granted approval thereof on December 15, 1950. Delivery of the cast-iron pipe commenced on February 16, 1951 and continued into March of 1951.

Winter weather made ground conditions unfavorable for the laying of the sewer line. Defendant's superintendent recognized that if the sewer system could not be installed before winter weather set in, the work would have to be carried over until the spring and summer of 1951. The sewer system was finally completed in the fall of 1951.

On September 3, 1952, the contracting officer issued Change Order JJJJJ, which cancelled Change Order T, increased the contract price for the sewer work by the amount of $53,465.45, and extended the contract time by 120 calendar days. The price increase represented the extra cost for performing the change work.

Plaintiff seeks delay damages in the form of additional overhead incurred as a result of the protracted performance ensuing from defendant's faulty sewer specifications and the undue delay in correcting the difficulties encountered.

■ As to plaintiff's first contention, defendant seems to argue that the difficulties encountered with respect to the sewer system resulted from changed conditions rather than faulty specifications and, as such, plaintiff is precluded from seeking delay damages. We need not decide this issue, since we find that the plaintiff is entitled to recover delay damages as a result of defendant's undue delay in correcting the sewer difficulties.

■ Defendant's Central Office was first apprised of the sewer difficulties early in November of 1949. It was not until March 9, 1950, that defendant proposed a solution for the problem. It was not until July 25, 1950, that defendant issued a change authorization. By that time the cast-iron pipe originally proposed was unavailable. Plaintiff so advised defendant in a series of communications dating from August 3 to September 29, 1950. It was not until October 23, 1950, that a change order was authorized. This was the first time plaintiff was authorized to do the necessary corrective work,[7] which was almost a year after defendant was made aware of the sewer difficulties. Here the contractor could not perform the work in accordance with the plans and specifications of defendant due to either a changed condition or negligent design. There is no provision in this contract which required plaintiff to independently find a solution to these problems, but rather it was incumbent on the contracting officer to investigate the changed con-

---

7. Defendant takes the position that if plaintiff had proceeded after the issuance of Change Authorization No. 13, of July 25, 1950, it could have acquired the necessary pipe and completed the sewer work within a month. However, a change authorization is not a change order. Defendant did not issue the order until October 23. Until then, plaintiff had no obligation to proceed.

dition or correct the faulty design and issue change orders where appropriate. The law gives him a reasonable time to carry out this contractual obligation. It took the contracting officer almost a year to perform this duty. Under such circumstances, we conclude that defendant breached its ever-present obligation to carry out its contractual duties within a reasonable time. Peter Kiewit Sons' Co., Inc. v. United States, 151 F.Supp. 726, 138 Ct.Cl. 668 (1957); Walsh v. United States, 102 F.Supp. 589, 121 Ct.Cl. 546 (1952). For this failure, the government will have to respond in damages for the resulting additional costs which plaintiff has encountered.

■■ It appears that the project as a whole was seriously affected by the sewer problems. Defendant's own superintendent advised Central Office more than once about the delay effect on the job by reason of inaction on the part of the Veterans Administration. Construction of utility lines, roads, walks, and parking areas, were all dependent upon an early completion of the sewer system. The delay resulting from the sewer system impeded progress on these and other phases of the project. Moreover, normal job sequence was interrupted and co-ordination of the work of the trades impeded. The contracting officer, by granting a 120-day extension, found an overall job delay to this extent and, moreover, admitted that the delays resulted through no fault of plaintiff. We need not in this case deduct a reasonable time interval for defendant to make revisions in the sewer system, since it took defendant almost a year to issue a change order and the delay recognized amounted only to approximately four months. We think that eight months was more than sufficient to make such a determination. For the foregoing reasons, we find that the government-caused delay with respect to the sewer system amounted to 120 days.

## II. MATERIAL SHORTAGES, ABNORMAL WEATHER, LABOR STRIKES

With respect to these claims, plaintiff seeks damages in the form of increased overhead costs for delays resulting from material shortages, abnormal weather, and strikes, which delays plaintiff claims would not have been encountered but for the original government-caused delays with respect to the foundation and sewer difficulties.

■■■ It is well settled that where delays are occasioned by factors beyond the control of the contractor or the government, a contractor cannot recover damages from the government for the delays, nor can the government properly assess liquidated damages against the contractor. Carman et al. v. United States, 166 F.Supp. 759, 143 Ct.Cl. 747 (1958). However, where government-caused delays force the contractor into more costly operations, the government will have to respond in damages for the resulting additional outlays. Abbett Electric Corp. v. United States, 162 F.Supp. 772, 142 Ct.Cl. 609, 614 (1958); Langevin v. United States, supra, 100 Ct.Cl. at 37.

### (A) Priorities

The Defense Production Act of 1950 was enacted on September 8, 1950, to divert certain materials and facilities from civilian to military use and related purposes on account of the Korean war which began in July of that year. Priority controls for certain materials went into effect in January of 1951. Thereafter, material shortages became an acute problem. In those siutations where a suitable substitute was available, the contracting officer allowed the substitution without change in the contract price or time for performance. However, an available substitute was not found in every situation, with the result that the progress under the contract was acutely delayed. The contracting officer recognized this fact and granted two extensions of time totaling 269 days. Both extensions of time were based upon the administrative determination by defendant's contracting officer that the delay was due to unforeseeable causes beyond the control and without the fault and negligence of plaintiff. The first extension was for plaintiff's inability to ob-

tain materials between March 1, 1951 and March 1, 1952, and the other extension covered the period of March 1, 1952 to July 31, 1953. Both extensions were predicated on detailed, written memoranda by the contracting officer, wherein specific reference was made to each material shortage and the effect thereof on the entire project. Our commissioner has found that these administrative determinations are fully supported by the record. Furthermore, our commissioner has found that had it not been for the earlier government-caused delays with respect to the foundations and sewers, the material shortages would have been substantially avoided.

Defendant seeks to avoid responsibility for these delays by arguing that some of the shortages might have occurred prior to March 1951 (the original completion date). In so doing, defendant points to some correspondence which it claims indicates that plaintiff was experiencing shortages prior to the scheduled completion date. Most of the instances which defendant points out are minor incidents in which plaintiff would request a substitution of one material for another. There is nothing in the record which suggests that there was an actual delay or that plaintiff would have experienced a delay because of these substitutions. Defendant did not introduce any testimony to this effect. However, it now wants us to infer from this unrelated correspondence a period of shortages which would have theoretically affected plaintiff.

Defendant attempts to demonstrate that the Veterans Administration was prompt and plaintiff was dilatory in handling priorities. Defendant argues that plaintiff was delayed by its own negligence in failing to comply with Veterans Administration instructions, by its lack of coordination with its suppliers, and by its failure to submit samples. Defendant has failed to tie-in all these allegations with a showing of an overall job delay attributable to plaintiff. Moreover, these allegations are contrary to the administrative determination that there was an overall job delay due to material shortages and priorities which were beyond the control of plaintiff.

As noted before, the administrative determination which resulted in the extensions of time were based on a thorough study of the record. These extensions of time, as a result of the material shortages, covered periods of performance after the originally scheduled completion date. The evidence in the record does not support defendant's contention that plaintiff would have encountered these shortages prior to March of 1952. More importantly, the priority controls went into effect in January of 1951, and under the originally scheduled completion date the project would have been substantially completed by that time. This all points to the inescapable conclusion that plaintiff would not have encountered these material shortages but for the original government-caused delays with respect to the foundations and sewers. The defendant is responsible for delays resulting from the material shortages to the extent determined by the contracting officer, i. e., 269 days.

(B) *Weather*

On August 23, 1951, plaintiff applied to defendant for a time extension of 83 calendar days for the period April 1, 1950 to August 1, 1951, due to alleged abnormal weather conditions described principally as excessive rainfall. On December 12, 1951, defendant, after evaluating plaintiff's application and the official weather reports, determined that the contract had been delayed 62 calendar days during the period due to unseasonably severe weather, and extended the contract time by 62 calendar days. Work in progress during this period involved foundations, sewers, landscaping, roadways, sidewalks and parking areas. Our commissioner has found that the weather adversely interfered with work which would have been completed prior to the bad weather beginning in April of 1950, had there not been the delays in the foundations and sewers.

This factual determination by our commissioner is substantiated by the

record. The unusually severe weather encountered after April of 1950 seriously impeded the foundation work on the buildings as well as work on outside utility lines, roadways and grading. The record supports the conclusion that this work would have been entirely completed prior to April 1, 1950, had it not been for the prior difficulties with respect to the foundations and sewers. If these difficulties had not occurred, the abnormal weather subsequent to April 1, 1950, would have had little, if any, delaying effect on the items of construction work which would have been in progress after that date. By that date, the foundation work would have been completed and the interior work could have been performed during the inclement weather. For these reasons, we conclude that the defendant is responsible for the 62 days in delays which plaintiff experienced as a result of the inclement weather.

(C) *Strike Delays*

 Plaintiff, during the construction of the project, was subjected to strikes which delayed the overall progress of the job. Defendant's contracting officer granted extensions of time therefor totaling 23 calendar days. Of this total, 17 days occurred subsequent to the original completion date, and plaintiff would not have been subject to these delays if the original government-caused delays had not occurred. We think that the government should respond to plaintiff in delay damages to that extent.

## III. INCREASED COSTS RESULTING FROM DEFENDANT'S BREACHES

Plaintiff claims that defendant's breaches of contract with respect to the foundations and sewers forced plaintiff's operations into periods of higher costs. Plaintiff seeks the increased costs incurred by reason of (1) excess maintenance of temporary road service; (2) additional temporary heating and snow removal; (3) higher wages for labor, exclusive of bricklayers, than would otherwise have been paid; (4) excess costs for performing the lathing and plastering work; and (5) increased wages paid bricklayers.

 As we noted before, where government-caused delays resulting in breaches of contract force the contractor into more costly operations, the government will have to respond in damages for the resulting additional outlays. Abbett Electric Corp. v. United States supra (increased labor costs); Langevin v. United States, supra (increased materials costs); Stapleton Construction Co., Inc. v. United States, supra (increased cost in performance of work of defaulting subcontractor).

(A) *Temporary Roads*

 Plaintiff, from about December 1, 1949, constructed and utilized temporary roads throughout the hospital site. Under plaintiff's original schedule, the maintenance of the temporary road service should have terminated prior to July 1, 1950, since the permanent roadways and parking areas would have been constructed by that date. Due to the delays in foundation and sewer work as previously found, the permanent roadways were not completed and in use until September 4, 1951. Consequently, plaintiff was required to undertake excessive maintenance beyond that originally contemplated to the extent of 61 weeks. Our commissioner has found that the excess cost to plaintiff in maintaining the roads was $3,347.44. Defendant contends that the estimate that the permanent roadways and parking facilities would be in use on July 1, 1950, is unrealistic. However, we are not told what a "realistic" completion date would be. Defendant also challenges the amount found by our commissioner. Defendant did not introduce any evidence rebutting plaintiff's computations with regard to the cost for the temporary roads; however, it seeks to undermine the costs allowed by arguing that the amount awarded by the commissioner is more than twice its total costs. The scheduled cost for this item

was approximately $2,694. This related to the anticipated 30 weeks of maintenance. Plaintiff was allowed $3,347.44 for the additional 61 weeks. Inasmuch as the site conditions were much more adverse and the period was double, the amount found by our commissioner seems very conservative. For these reasons, plaintiff is entitled to recover $3,-347.44 as damages flowing directly from defendant's breach of contract in this respect.

(B) *Temporary Heating and Snow Removal*

 As a result of the government-caused delays in foundation and sewer work, plaintiff was required to provide additional temporary heating during the construction in the winters of 1951–1952 and 1952–1953. Further, plaintiff incurred labor costs during the 1951–1952 winter necessary to remove heavy amounts of snow so construction could go forward. Our commissioner has found the amounts expended therefor totaled $49,277.30. He has further found that these sums would not have been incurred but for the original government-caused delays with respect to the foundation and sewer problems. The amount awarded was verified by defendant on audit. However, defendant argues that plaintiff is precluded from recovering these costs (snow removal) because it failed to seek an extension of time. The fact that the contractor did not ask for an extension of time is immaterial to his right of recovery for these additional outlays resulting from defendant's earlier breaches. The snow removal apparently did not delay the project; nevertheless, plaintiff incurred these expenses because of defendant's earlier breaches. Consequently, plaintiff is entitled to recover $49,277.30.

(C) *Losses on Labor, Exclusive of Bricklayers*

As a result of the government-caused delays heretofor described, the project was shifted into a period of higher wages for laborers, exclusive of bricklayers. Subsequent to March 19, 1951 (original completion date), plaintiff paid the sum of $25,386.33 for the increased amount of wages. In addition, plaintiff paid certain other increased labor expenses subsequent to March 16, 1951, for union welfare dues, retroactive pay increases and travel time, in the sum of $3,818.56. Consequently, plaintiff incurred the sum of $29,204.89 in increased labor costs which it would not have incurred but for the original government-caused delays.

 Defendant seeks to disallow these sums on the ground that the increased wages represented a business risk. Defendant is correct in contending that increased wages is a business risk if encountered during the originally scheduled performance time. However, if performance is extended as a result of government-caused delays beyond the original completion date, an increase in wages after this period cannot be considered a risk which the contractor assumed. Such increased costs flow directly from defendant's prior breaches. Abbett Electric Corp. v. United States, supra. Consequently, plaintiff is entitled to recover $29,204.89.

(D) *Losses on Subcontracts*

Plaintiff entered into a subcontract with the Wayne Plastering Company for the performance by that company of all lathing and plastering on the hospital project for the amount of $294,000. Subsequent change orders amended this amount to $287,186.02. Plaintiff claims that due to the delays it was required to take over this work and assume financial responsibilitly for its completion. Plaintiff's records, which were verified by defendant, reflect expenditures on behalf of this subcontractor totaling $389,-949.62, including $40,325.77 in back charges. This results in an overage of $102,763.30 above the subcontract amount, which overage is claimed by plaintiff.

Our commissioner has found that due to the original delays plaintiff's subcontractor did not perform and plaintiff was forced to take over the work through completion at an additional cost.

Defendant's basic position is that there is no causal connection between the foundation and sewer difficulties and the plastering work. Our commissioner has found to the contrary. In the evidentiary record made in this case, there is much to support the commissioner's determination. Due to the protracted performance of the initial phases of this project, the Wayne Plastering Company's work was being done under entirely different circumstances as to labor and materials than was contemplated. Because of the increased costs of performance, the subcontractor could not financially continue. It became necessary for the plaintiff to assume responsibility for the purchase of materials and payment of the subcontractor's workmen. Under such circumstances, we think that plaintiff has established the necessary cause and effect.

Defendant refers to two other similar claims which were disallowed by the commissioner. Inasmuch as plaintiff has not excepted, they are no longer in issue. However, defendant argues that these other subcontractors contradicted plaintiff's contentions. This is an issue of credibility, and the commissioner had ample and full opportunity to evaluate the reliability of the witnesses. Under such circumstances, we accept the judgment of the trier of facts.

 The commissioner has found that plaintiff expended $62,154.06 in excess of the subcontract price. He has disallowed plaintiff's claim for back charges of approximately $40,000. Defendant argues that the proper measure of damages with respect to this claim is arrived at through the use of the "total cost" theory, since in this instance it would be to the advantages of the government. However, we do not think it proper to use the "total cost" method here, since the exact amount of excess costs which plaintiff incurred as a result of defendant's breach can be precisely computed. Consequently, plaintiff is entitled to recover $62,154.06.

(E) *Losses on Labor of Bricklayers*

 Subsequent to March 16, 1951 (original completion date) plaintiff paid the sum of $13,989.54 over and above what would have been paid if the labor had been performed prior to the scheduled completion date. Defendant is responsible for these increased costs, and plaintiff is entitled to recover $13,989.54.

## IV. CHANGES BEYOND THE SCOPE OF THE CONTRACT

Defendant issued 27 miscellaneous change orders for contract extras in the last half of 1952 and the first half of 1953. On November 3, 1953, an extension of 120 days was granted therefor. At the time these orders were issued by defendant the work was not less than 84 percent complete and it was completed in July of 1953. Subsequently, six additional change orders were issued for work which was not included in the original contract plans and specifications. As a result thereof, the contracting officer granted extensions of time totaling 102 days.

Plaintiff contends that the various changes, taken cumulatively, constitute a cardinal alteration of the contract and were, therefore, outside the permissible limits of the "Changes" article.

 We have recognized that the point at which a change must be considered to be beyond the scope of the contract and inconsistent with the "Changes" article is a matter of degree varying from one contract to another. Saddler v. United States, 287 F.2d 411, 152 Ct.Cl. 557 (1961). Moreover, "a determination of the permissive degree of change can only be reached by considering the totality of the change and this requires recourse to its magnitude as well as its quality." Id. 287 F.2d at 413, 152 Ct.Cl. at 561. Neither the num-

ber of changes nor the characteristics of the work to be performed is of itself the determinative factor. Aragona Construction Co., Inc. v. United States, Ct.Cl. No. 345–59, decided April 17, 1964.

Here we think that the series of changes, even if taken cumulatively, did not result in a fundamental alteration of the contract. Plaintiff recognizes that the miscellaneous changes here did not alter the physical results in the perspective of the overall project. The finished project was substantially the same as originally contracted for. Aragona Construction Co., Inc. v. United States, supra. The number of changes (33) are not unreasonably large in number for a project of this size. However, plaintiff argues that the time expended to perform these changes in relation to their actual cost is unreasonable. This factor has never been used as a criterion in determining whether the changes ordered are beyond the permissible limits of the "Changes" article of the contract. Plaintiff also argues that the fact that they were issued at the end of the project makes them unreasonable. We know of no contract requirement or any obligation imposed by law which restricts the government's power to order changes within a specified period. The "Changes" article in this contract provided that "[t]he contracting officer may *at any time,* by a written order, * * * make changes in the drawings and/or specifications of this contract and within the general scope thereof." The only restrictive language found in this clause is the phrase "within the general scope thereof." We think this means that the contracting officer can order changes as long as the finished project was substantially the same as originally contracted for. The fact that performance was extended is immaterial, since the contractor is not precluded from recovering overhead in its costs for the added work. As a matter of fact, some overhead was allowed with respect to some of the changes ordered. Plaintiff's failure to appeal the amounts allowed as part of

the equitable adjustment precludes it from now seeking them in this court.

*Summary of Government-Caused Delays*

As a result of the previously discussed breaches of contract, the government is responsible for the delays resulting from:

| | | Extent of Delay |
|---|---|---|
| I | *Faulty Specifications* | |
| | (a) Piles | 125 |
| | (b) Spread Footings | 45 |
| | (c) Sewer | 120 |
| II | *Shortages, Weather & Strikes* | |
| | (a) Material Shortages | 269 |
| | (b) Abnormal Weather | 62 |
| | (c) Labor Strikes | 17 |
| | Total | 638 |

## V. FISCHBACH & MOORE SUBCONTRACT

On November 17, 1949, plaintiff entered into an agreement with useplaintiff Fischbach & Moore, Inc., whereby the latter, as subcontractor, agreed to furnish all labor, materials and equipment necessary for the installation of all electrical work for the Ann Arbor project. The electrical subcontractor had to adapt its work to the general progress of the job since electrical equipment and materials were, generally, to be installed in facilities which first had to be built. The government-caused delays discussed above, and for which plaintiff was not to blame, delayed the work of the electrical subcontractor beyond the originally contemplated completion date, interrupted the normal sequence of its work, and increased its costs of performance. These delays required the subcontractor to perform excess manhours of labor in the amount of 29,759 hours. The cost of this excess labor was $88,362.85 plus $6,454.02 for taxes and insurance. In addition, the subcontractor expended an additional $620 and $11,947.74 for job overhead and home office overhead during the excess period. These total excess costs amounted to $107,384.61 for the 868 days of contract overrun, or at the rate of $123.71 per day. Since we have

found that defendant is responsible for 638 days of delay, the plaintiff is entitled to recover on behalf of its subcontractor $78,926.98.[8]

The government's defense with respect to the subcontractor's claim is that the government is not responsible for the original delays. We have already decided to the contrary, so that any further discussion is unnecessary.

## VI. DAMAGES

As in all breach of contract cases, the proper measure of damages for defendant's breaches is the amount of plaintiff's extra costs directly attributable to said breaches. Saddler v. United States, supra. These take the form of delay damages compensated as increased overhead incurred as a result of the protracted performance. Moreover, the contractor is entitled to recover its additional expenditures directly attributable to the breach. In computing the additional overhead, we have held that a contractor is entitled to recover as damages the amount of overhead on a daily basis allocable to the period of overrun for which the government is responsible. F. H. McGraw & Company v. United States, 130 F.Supp. 394, 131 Ct.Cl. 501 (1951); Fred R. Comb Co. v. United States, 103 Ct.Cl. 174 (1945).

Defendant properly contends that the excess costs claimed must be tied in to defendant's breaches. The commissioner's report which we have adopted attributes each and every item of cost to the various delays and faulty plans. Defendant does not amplify or explain in what way there is a lack of tie-in. We are satisfied that the necessary causal connection has been established.

With respect to the overhead items, defendant contends that it is being required to pay overhead twice. Defendant's audit report submitted in evidence does not reflect this. Defendant did not contend this in its proposed findings, nor did it object to plaintiff's proposed findings on this basis. Moreover, we have carefully gone through all change orders and deducted from plaintiff's overhead recovery all overhead received by it through change orders.

Our commissioner has found that the allocation of home office overhead to this job amounted to $223,576.26, or $158.79 per day over the performance period of 1,408 days. The government does not challenge the correctness of this figure. Since we have found government-caused delays to the extent of 638 days, plaintiff is entitled to recover $101,308.02.

For the delay period of 638 calendar days, plaintiff's job overhead applicable to said delay is $95,470.32. By Change Orders QQQ and JJJJJ, defendant granted plaintiff $2,286.86 in overhead. Therefore, plaintiff is entitled to recover $93,183.46.

*Summary of Damages*

| | |
|---|---|
| Subcontractor's claim | $ 78,926.98 |
| Costs incident to changes in foundation | 86,621.15 |
| Maintenance of temporary roads | 3,347.44 |
| Temporary heating and snow removal | 49,277.30 |
| Home office overhead | 101,308.02 |
| Job overhead | 93,183.46 |
| Losses on labor, exclusive of bricklayers | 29,204.89 |
| Losses on subcontracts | 62,154.06 |
| Losses on labor of bricklayers | 13,989.54 |
| | $518,012.84 |

Plaintiff claims it is entitled to a profit of ten percent on those excess costs included in (1) costs incident to changes in foundations, (2) maintenance of temporay roads, and (3) temporary heating and snow removal except for the amounts of payroll taxes and insurance included therein. We have held in the past that a contractor is not entitled to profit on the amount of damages arising from a breach of contract. Oliver-

---

8. Our commissioner's suggested finding with respect to these damages was based on 854 days of government-caused delays.

Finnie Co. v. United States, supra. We see no reason why we should depart from our prior holding. Therefore, plaintiff is not entitled to recover profits.

For the foregoing reasons, plaintiff is entitled to recover $518,012.84, and judgment is entered to that effect.